# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19- 80064-TLS |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING AGREEMENT, (II) APPROVING PROCEDURES FOR STORE CLOSING SALES, AND (III) GRANTING RELATED RELIEF

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to assume that certain Consulting Agreement, dated as of January 14, 2019 (the "Consulting Agreement"),[2] by and between Specialty Retail Shops Holding Corp. (the "Merchant") and Gordon Brothers Retail Partners, LLC (the "Consultant"), a copy of which is attached hereto as **Exhibit A**; (b) authorizing the Debtors to assume (i) the *Letter Agreement*, dated September 24, 2018, among Consultant, and Shopko Stores Operating Co., LLC, (ii) the *Letter Agreement*, dated

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Consulting Agreement.

October 31, 2018, among Consultant and Shopko Stores Operating Co., LLC, (iii) the *Letter Agreement*, dated December 5, 2018, among Consultant and Shopko Stores Operating Co., LLC; and (iv) the *Letter Agreement,* dated December 18, 2018, among Consultant, and Shopko Stores Operating Co., LLC (collectively, the foregoing the "Letter Agreements"); and (c) authorizing and approving up to 39 store closing or similar themed sales, and such additional sales as the Debtors deem appropriate, contingent upon lease negotiations with the Debtors' landlords, starting on or about January 17, 2019, in accordance with the terms of the sale guidelines (the "Sale Guidelines") attached hereto as **Exhibit B**, with such sales to be free and clear of all liens, claims, and encumbrances (the "Sales"); and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within 25 days after the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

### Jurisdiction, Venue, and Procedural Background

2.    The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The bases for the relief requested herein are sections 105(a), 363, 365, and 554 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, and 6004, and Rule 9013-1.C of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules").

## Background

### I.    General Background.

5.      The Debtors are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as company operated pharmacy and optical services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and operate approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b)  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

7.      A description of the Debtors' businesses is more fully set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

### II.    The Store Closings.

8.      Over the past several years, the Debtors have faced a challenging commercial environment brought on by increased competition from traditional competitors, the entry of new competitors employing new methods to enhance the customer experience, and a shift in consumer

preferences away from shopping at brick and mortar stores to online retail channels.  These factors have left the Debtors with a significant number of stores operating at sub-optimal performance levels.

9.      Recognizing the need to right-size the Debtors' store base, the Debtors' management team and advisors conducted an extensive store-by-store performance analysis of all existing stores evaluating, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each store is located, the mall in which each store is located, the potential to negotiate rent reductions with applicable landlords, and specific operational circumstances related to each store's performance (the "Performance Evaluation").

10.      The Debtors' management team and advisors ultimately determined that it may be appropriate to close and wind down (the "Store Closings") 39 underperforming brick-and-mortar store locations (the "Closing Stores" which are also attached hereto as **Exhibit C**), contingent upon lease negotiations with the Debtors' landlords.  The determination of whether or not to close additional stores will depend on whether the Debtors are able to negotiate more favorable lease terms and rent reductions for certain stores with their landlords (the "Lease Negotiations"). The Debtors also plan to retain Hilco Real Estate, LLC to assist with the ongoing Lease Negotiations.  The Debtors expect to complete these negotiations and finalize the list of closing stores in April 2019.

11.      In order to maximize the value of their estates, the Debtors may need to close additional stores (such stores, the "Additional Closing Stores," and together with the Closing Stores, the "Stores") following the Lease Negotiations.  A majority of the Stores have negative sales trends and have failed to meet the performance standards set by the Debtor.

12.     In conjunction with the Performance Evaluation, the Debtors also conducted a detailed review and analysis of their inventory levels, identifying additional aged inventory. This inventory will be included in and sold as part of the Sales along with the original salable store inventory (collectively, the "Merchandise"). The Debtors expect that the bulk of the Sales and Store Closings will continue through approximately April, 2019. The Debtors estimate that the gross proceeds from the Sales will be approximately $80 to $95 million.

**III.    Consultant Selection Process**

13.     In 2012, the Debtors conducted a bidding process to select a consultant to assist in evaluations of potential store closings and wind downs, during which the Debtors solicited bids from several firms. After an extensive evaluation process, the Debtors determined that the Consultant provided the best and most competitive proposal. Since that time, the Consultant has worked with the Debtors to liquidate more than 200 store locations and outperformed past appraisals. The Debtors have thus been very satisfied with the Consultant's previous work.

14.     Prior to the Petition Date, the Debtors, in consultation with the agent under their secured credit facility, Wells Fargo Bank, N.A., and Berkeley Research Group, LLC, negotiated the Consulting Agreement with the Consultant. The Consulting Agreement reflects current market conditions, pricing, and terms. The Debtors have contracted with the Consultant to manage the Sales as well as to sell their furniture, fixtures, and equipment (the "FF&E," and together with the Merchandise, the "Store Closure Assets") located in the stores and otherwise prepare the stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement. Based on the Consultant's past performance, experience with similar store closings in rural areas, and familiarity with the Debtors' product mix, the Debtors decided to continue with the Consultant's services.

15.     By this Motion, the Debtors seek to assume the Consulting Agreement and Letter Agreements so that the Consultant may (i) continue its preparation for, and completion of, the Store Closings on a postpetition basis without interruption. The Debtors also seek the authority to potentially allow the sale of Additional Consultant Goods and participate in an Augmentation Program, each as permitted and allowed under the Consulting Agreement.  The Debtors have determined, in an exercise of their business judgment, that (a) the services of the Consultant are necessary for a seamless and efficient large-scale execution of the Store Closings and Sales, as is contemplated by this Motion, and to maximize the value of the assets being sold, and (b) the Consultant is capable of performing the required tasks on favorable financial terms, as determined by the evaluation process.

16.     Further, the Store Closings are a critical component of the Debtors' go-forward business plan, and assumption of the Consulting Agreement will allow the Debtors to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates. Additionally, the ability of the Debtors to file an Additional Closing Stores List provides the Debtors necessary flexibility to effectively reorganize.  The relief requested in this Motion is integral to maximizing the value of the Debtors' estates.  It will permit the Debtors to commence the Store Closings in a timely manner as contemplated by this Motion and will establish fair and uniform sale guidelines to assist the Debtors and their creditors through the Debtors' transition to a smaller, more profitable enterprise.

## IV.     The Consulting Agreement

17.     Pursuant to the Consulting Agreement, the Consultant will serve as the exclusive Consultant to the Debtors in connection with the Sales.  Assumption of the Consulting Agreement will allow the Debtors to utilize the logistical capabilities, experience, and resources of the Consultant in performing large-scale liquidations in a format that allows the Debtors to retain

control over the sale process.  A summary of the salient terms of the Consulting Agreement is set

forth below.[3]

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Services Provided by Consultant** | Merchant hereby retains Consultant as its exclusive, independent consultant to conduct the Sale at the Stores during the Sale Term (as defined below), and in connection therewith, Consultant shall, throughout the Sale Term:  (a) recommend appropriate merchandise discounting, point-of-purchase, point-of-sale, and other internal and external advertising and signage, and merchandise presentation, in each case as necessary to effectively sell all of the Merchandise (as defined below) in accordance with a "store closing" or other mutually agreed upon themed sale; (b) provide qualified supervisors with respect to the Stores to oversee the Sale process in the Stores; (c) maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale; (d)  recommend Sale-related customer service and housekeeping activities; (e) recommend Sale-related staffing levels for the Stores; (f) recommend Sale-related loss prevention initiatives; (g) assist Merchant to commence the Sale with a mutually agreed upon theme as may be approved (x) by the parties consistent with any required permitting or (y) in the event Merchant becomes subject to any chapter 11 proceeding before any United States Bankruptcy Court, by the Bankruptcy Court in any Approval Order. |

---

[3]  The following summary chart is for the convenience of the Bankruptcy Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Term of Sale** | The "Sale Term" with respect to the Stores shall commence January 18, 2019 and shall terminate no later than April 14, 2019 ("Sale Termination Date"); provided however that the parties may fix a sooner or later Sale Termination Date (on a Store-by-Store basis at any one or more Stores) upon mutual written agreement (and in the case of a later Sale Termination Date, a mutually agreed upon revision to the budget for the "Consultant's Controlled Expenses"). |
| **Expenses of Consultant** | All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term (including without limitation all Consultant Controlled Expenses (as defined below) and all other store-level and corporate expenses associated with the Sale) shall be borne by Merchant; except solely for any of Consultant's Controlled Expenses that exceed the aggregate budgeted amount (as provided in the Consulting Agreement) for such Consultant Controlled Expenses.<br><br>The Consultant's Controlled Expenses include without limitation, expenses for advertising, signage, Consultant's Supervisor's fees/deferred fees/administrative fees and expenses, and miscellaneous expenses.<br><br>In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with the Consulting Agreement, including without limitation in the event of any Bankruptcy Case, with respect to obtaining entry of the approved Order and/or negotiating with landlords of the Stores. The parties may from time to time mutually agree in writing to increase the budget of Consultant's Controlled Expenses based upon circumstances of the Sale. |

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Compensation for Consultant** | Merchant shall pay Consultant a "Merchandise Fee" equal to the sum of (i) the amount based upon one of the applicable thresholds of Gross Big Box Recovery Percentage plus (ii) the amount based upon one of the applicable thresholds of Gross Hometown/Express Recovery Percentage (e.g., in each case of (i) and (ii), back to first dollar)[4].<br><br>Merchant shall pay Consultant an amount equal to (i) 1.00% of Gross Big Box Proceeds plus 1.25% of Gross Hometown/Express Proceeds on account of the prior week's sales as an advance on account of the Merchandise Fee weekly plus any Non-Merchandise Fee and FF&E Commission (as defined in the Consulting Agreement) earned during the prior week (as part of each weekly reconciliation contemplated by Section 5(B) of the Consulting Agreement), subject to final confirmation and any necessary corrections as part of the Final Reconciliation. The parties shall determine the definitive Gross Big Box Recovery Percentage, Gross Hometown/Express Recovery Percentage, Merchandise Fee, Non-Merchandise Fee, and FF&E Commission (and in the case of Merchant, any Additional Consultant Goods Fee, as defined in the Consulting Agreement, if any) in connection with the Final Reconciliation. Immediately thereafter (and as part of the Final Reconciliation), Merchant or Consultant, as the case may be, shall pay any additional amount owed on account of such fees. |

---

[4] The thresholds for the Compensation for Consultant are defined in the Recovery Percentage and Fees charts below on page 10 of this Motion.

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Merchant's Insurance Obligations** | During the Sale Term Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations.<br><br>Notwithstanding any other provision of the Consulting Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores, and Merchandise sold in the Stores, before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct or unlawful acts of Consultant. |
| **Merchant & Consultant's Insurance Obligations** | Merchant and Consultant shall each maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury, and/or property damage. Each party shall use commercially reasonable efforts to have: (a) the other party named as an additional insured on all such insurance of the other party; (b) all such insurance be non-cancelable and non-changeable except upon 30 days' prior written notice to the other party; and (c) certificates of all such insurance delivered to the other party as soon as practicable following the execution of the Consulting Agreement.<br><br>Notwithstanding any other provision of the Consulting Agreement, Merchant and Consultant agree that (i) Consultant shall not be deemed to be in possession or control of the Stores or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) Consultant does not assume any of Merchant's obligations or liabilities with respect to any of the matters addressed in subsection (i) above. This paragraph shall not limit Consultant's indemnification rights as set forth below. |
| **Indemnification by Consultant** | Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | employees, consultants, and independent contractors harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates, or their respective officers, directors, employees, agents, independent contractors, or representatives; (iii) the negligence, willful misconduct or unlawful acts of Consultant, its affiliates. or their respective officers, directors, employees, agents, independent contractors, or representatives; or (iv) the failure to comply with any applicable Liquidation Sale Laws (except to the extent such compliance with exempted under the Approval Order), or any consumer warranty or products liability claims, arising out of or related to (a) the sale of Additional Consultant Goods or (b) any Augmentation Program; or (v) Consultant's failure to conduct the Sale in compliance with any applicable General Laws. |

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Indemnification by Merchant** | Merchant shall indemnify and hold Consultant, its affiliates, and their respective officers, directors, employees, consultants, and independent contractors harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (a) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; (b) any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement, except where due to the negligence, willful misconduct or unlawful acts of Consultant, its affiliates, or their respective officers, directors, employees, agents, independent contractors, or representatives; (c) any consumer warranty or products liability claims relating to any Merchandise; (d) any claim relating to the compromise of any customer personally identifiable information; (e) the negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors, or representatives; and/or if applicable, any proceedings before the Bankruptcy Court or any other court of competent jurisdiction regarding the Consulting Agreement, including obtaining approval thereof and/or defending against any objection thereto. |

**Recovery Percentage and Fees**

| Gross Big Box Recovery Percentage | Merchandise Fee (Big Box) |
|---|---|
| Below 128.00% | 1.00% of Gross Big Box Proceeds |
| Between 128.00% to 130.99% | 1.25% of Gross Big Box Proceeds |
| Between 131.00% to 132.99% | 1.50% of Gross Big Box Proceeds |
| Between 133.00% to 134.99% | 1.75% of Gross Big Box Proceeds |
| Between 135.00% to 137.99% | 2.00% of Gross Big Box Proceeds |
| Above 138.00% | 2.25% of Gross Big Box Proceeds |

| Gross Hometown/Express Recovery Percentage | Merchandise Fee (Hometown/Express) |
|---|---|
| Below 110.00% | 1.25% of Gross Hometown/Express Proceeds |
| Between 110.00% to 112.99% | 1.50% of Gross Hometown/Express Proceeds |
| Between 113.00% to 115.99% | 1.75% of Gross Hometown/Express Proceeds |
| Between 116.00% to 117.99% | 2.00% of Gross Hometown/Express Proceeds |
| Between 118.00% to 119.99% | 2.25% of Gross Hometown/Express Proceeds |
| Above 120.00% | 2.50% of Gross Hometown/Express Proceeds |

## V.   The Sale Guidelines.

18.    The Debtors seek approval of streamlined procedures (the "Sale Guidelines") to sell the Store Closure Assets, in each case free and clear of liens, claims and encumbrances.  The Debtors also seek approval of the Sale Guidelines to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Bankruptcy Court's approval.  The Debtors seek interim approval of the Sale Guidelines in light of the need to start the Sales as soon as possible so that the Debtors can complete the Sales prior to the Debtors' emergence from chapter 11.  In light of the tight restructuring milestones in the Debtors' postpetition financing credit agreements, the Debtors are required to emerge from chapter 11 within approximately 90 days.  Therefore, the Debtors must be able to begin the Sales as soon as possible.

19.    The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets in order to maximize their value to the estates.

## VI.    Liquidation Sale Laws and Dispute Resolution Procedures.

20.    Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").  Liquidation Sale Laws may establish licensing,

13

permitting or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings. Such requirements would hamper the Debtors' ability to maximize value in selling their inventory. Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines shall control.

21.     For the purpose of orderly resolving any disputes between the Debtors and any "Governmental Units" (as defined in section 101(27) of the Bankruptcy Code) arising due to the Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), as set forth in the Interim Order and the Final Order:

i.      Provided that the Sales are conducted in accordance with the terms of the Interim Order, or the Final Order, as applicable, and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of the Interim Order, or the Final Order, as applicable, and the Sale Guidelines without the necessity of further showing compliance with any Liquidation Sale Laws.

ii.     Within three business days after entry of the Interim Order, the Debtors will serve by first-class mail, copies of the Interim Order, the proposed Final Order, the Consulting Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; (d) the chief legal counsel for the local jurisdiction; and (e) the landlords for the Stores (collectively, the "Dispute Notice Parties").

iii.    With respect to any Additional Closing Stores, within three business days after filing any Additional Closing Store List with the Bankruptcy Court, the Debtors will serve by first-class mail, copies of the Interim Order or Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

iv.    To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Consulting Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within 10 days following entry of the Interim Order, or service of an Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Travis Bayer, Esq.; and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven N. Serajeddini, Esq., (b) proposed local counsel to the Debtors McGrath North Mullin & Kratz, P.C. LLO, 1601 Dodge St., Omaha, Nebraska 68102, Attn:  James Niemeier, Esq., and (c) Riemer Braunstein, Seven Times Square, New York New York 10036, Attn: Steven Fox, Esq.  If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

v.    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order, or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of any Interim Order or Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, absent further order of the Bankruptcy Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Bankruptcy Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith.   The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

## VII.    Fast Pay Laws.

22.    Many states in which the Debtors operate have laws and regulations that require the

Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast

Pay Laws" and together with the Liquidation Sale Laws, the "Applicable State Laws").  These

laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

23.    The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated during the Store Closings.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.  This process requires the Debtors' payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing.  Given the number of employees who will likely be terminated during the Store Closings, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.  The Debtors request that the Court allow the Debtors to be exempt from the Fast Pay Laws to the extent such non-compliance is the result of the Debtors' systems.

## VIII.    Lease Restrictions.

24.    The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings and Sales.  In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or

16

provisions. Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

25.     The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closings, the Sales or institute any action against the Debtors in any court (other than in the Bankruptcy Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales or the advertising and promotion (including through the posting of signs) of the Sales.

## Basis for Relief

### I.     The Court Should Authorize the Assumption of the Consulting Agreement.

26.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is governed by the whether or not "business judgment" standard assumption or rejection. *See, e.g.*, *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("The process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one"). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

17

27.    In applying the "business judgment" standard, courts show substantial deference to the debtor's decision to assume or reject. *See Summit Land Co.* v. *Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (citing that absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course"). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders* v. *Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith* v. *Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)). The business judgment rule applies in chapter 11 cases. *See Id.* at 656 ("Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11."); *See also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

28.    Here, the Debtors have satisfied the "business judgment" standard and have a sound business reason for seeking to assume the Consulting Agreement. The Sales are a significant component of the Debtors' efforts to maximize value because these sales enable the Debtors to sell Store Assets at the Closing Stores in a manner that is designed to maximize efficiency and increase overall profitability. Each Closing Store is either underperforming or unprofitable, and thereby constitutes a drain on liquidity. Allowing the Sales—which commenced prepetition—to proceed in accordance with the Sale Guidelines will allow the Debtors to most efficiently and quickly monetize the Store Assets in a uniform and orderly process with the assistance of an experienced

Consultant.  Assumption of the Consulting Agreement will allow the Debtors to engage the Consultant, on a postpetition basis, to manage the Sales at the designated Closing Stores.

29.    In consultation with their advisors, the Debtors determined that the Stores are a burden to their estates, and that the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors.  Further, after extensive, arm's-length negotiations, the Debtors believe that the Consulting Agreement contains the most favorable terms available under the circumstances.

30.    The Consultant has extensive expertise in conducting liquidation sales and can oversee, and assist in the management and implementation of, the Store Closings in an efficient and cost effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings and Sales for the benefit of all stakeholders.  If the Consulting Agreement is not assumed on an interim basis, there could be substantial harm to all stakeholders.  For example, the estate would lose the benefit of the momentum and preparation that has already been started by the Consultant in commencing the Store Closings prepetition.  Finally, given the number of Stores and the particular issues in administering the Store Closings, it is not certain the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant.

31.    Courts hearing chapter 11 cases filed by retailers have recently approved the assumption of similar consulting agreements.  *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Apr. 6, 2017) (authorizing assumption of a consulting agreement); *see also In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Brookstone Holdings Corp.*, No. 18-11780 (BLS) (Bankr. D. Del. Oct. 9, 2018) (same); *In re Vitamin World, Inc.,* No. 17-11933 (KJC) (Bankr. D. Del. Nov. 21, 2017) (authorizing entry into

consulting agreement); *see also In re rue21, inc.,* No. 17-22045 (GLT) (Bankr. W.D. Pa. May 18,

2017) (authorizing assumption of consulting agreement); *In re Bon-Ton Stores, Inc.,* No. 10248

(MFW) (Bankr. D. Del. Mar. 8, 2018) (same); *In re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr.

E.D. Va. July 11, 2017) (same); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (SCC)

(Bankr. S.D.N.Y. Mar. 2, 2017) (same); *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr.

S.D.N.Y. May 6, 2016) (same).[5]

32.    Pursuant to this Motion, the Debtors seek, on an interim basis, an order that

confirms that the Consulting Agreement is operative and effective.  On a final basis, the Debtors

seek authority to assume the Consulting Agreement.  For the reasons stated above, the Debtors

submit that they have exercised their reasonable business judgment in seeking to assume the

Consulting Agreement and thereby engaging and enabling the agent to proceed with the Sales at

the Closing Stores.

## II.    The Court Should Approve the Sale Guidelines.

33.    The Court may authorize the Debtors to consummate the Store Closings pursuant

to sections 363(b) and 105(a) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code

provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

Pursuant to section 363(b) of the Bankruptcy Code, for the purpose of conducting the Store

Closings, the Debtors need only show a legitimate business justification for the proposed action.

*See, e.g.*, *In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ("A

debtor in possession may sell substantially all of its assets under 11 U.S.C. Section 363(b)(1) so

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request to the Debtors' proposed counsel.

long as the court can 'expressly find from the evidence presented before [it] at the hearing a good business reason to grant such an application.'" (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *see also In re On-Site Sourcing, Inc.*, 412 B.R. 817, 822 (Bankr. E.D. Va. 2009) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*)), 722 F.2d 1063, 1070 (2d Cir. 1983); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").  When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." *Integrated Res.*, 147 B.R. at 656 (citations omitted).

34.    Furthermore, ample business justification exists to conduct the Store Closings. Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to:  (a) identify underperforming stores; (b) consider whether the store's performance can be improved by various initiatives, including through the negotiation of lease concessions with landlords; and (c) determine what stores should be closed promptly to eliminate their ongoing negative impact on the Debtors' financial performance and to improve the Debtors' liquidity.  This process has resulted in the Debtors' identification of the Stores.

35.    As noted in the preceding section, once a debtor has articulated a valid business justification, the court accords great deference to such judgment, even in the context of chapter 11 cases.  *See In re Integrated Res., Inc.,* 147 B.R. at 656; *In re Johns-Manville Corp.,* 60 B.R. at 615-16.  The benefit of the business judgment rule is equally applicable in the context of sales under section 363.  *See, e.g.*, *Fulton State Bank* v. *Schipper (In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991) ("[D]ebtor in possession can sell property of the estate outside the ordinary course of business if. . . he has an 'articulated business justification.'"); *Stephens Indus., Inc.* v. *McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (authorizing sale of debtor's assets pursuant to section 363 "when a sound business purpose dictates such action") (citation omitted).  The Third Circuit has explained that "under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification" with respect to sales under section 363.  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996).

36.    As discussed in the preceding section, the Debtors have determined, in the sound exercise of their business judgment, that continuing the Sales at the Closing Stores on and after the Petition Date, or as soon thereafter as possible, is essential to their reorganization efforts in order to minimize administrative expenses and liquidate assets at certain unprofitable locations as efficiently and quickly as possible.  The Sale Guidelines allow the Debtors to move forward with a uniform and orderly process of monetizing the Store Assets at the Closing Stores, with the aid and efforts of an experienced agent to maximize value and efficiency.  Without the Sale Guidelines, the Debtors are unlikely to be able to liquidate such assets as effectively and efficiently, which will impede their ongoing restructuring efforts, to the detriment of all interested parties.

37.     In addition, the Court may authorize the Store Closings based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize any action that is essential to the continued operation of a debtor's businesses.  *See In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) (discussing "doctrine of necessity" with respect to payment of critical vendors); *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (holding "doctrine of necessity" may be invoked where the debtor shows payment of prepetition claims is "critical to a debtor's reorganization"); *see also In re Fin. New Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's organization).  Importantly, delay in consummating the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, chief among them that the Stores fail to generate positive cash flow and therefore are a drain on liquidity.  Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Stores.  Further, the swift and orderly commencement of the Store Closings will allow the Debtors to timely reject the applicable Store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment. Delaying just a portion of anticipated the Store Closings may cause the Debtors to pay postpetition rent at many of these stores, at a possible cost to the estate of approximately $1.5 to $2.1 million per month.

38.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates,

and is justified under sections 363(b) and 105(a) of the Bankruptcy Code.  The Debtors and their advisors believe that the Sale Guidelines represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.

39.    Courts in this jurisdiction and other districts have recently approved sale guidelines in chapter 11 cases on an interim basis, and numerous courts have granted retail debtors first-day authority to implement such procedures.  *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Apr. 6, 2017) (authorizing the store liquidation and closing sales); *In re Pawn Am., LLC*, No. 17-31145 (RJK) (Bankr. D. Minn. Apr. 14, 2017) (same); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Total Hockey, Inc.*, No. 16-44815 (CER) (Bankr. E.D. Mo. Aug. 23, 2016) (approving agency agreement as backup liquidation bid); *In re Bakers Footwear Grp., Inc.*, No. 12-49658 (CER) (Bankr. E.D. Mo. Jan. 14, 2013) (authorizing debtors to enter into agency agreement and conduct store closings); *see also In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn. 2017) (granting first-day relief).[6]  The sale guidelines approved in the foregoing cases are substantially similar to the Sale Guidelines attached hereto.

**III.    The Court Should Approve the Sale of the Store Closure Assets Free and Clear of All Liens, Encumbrances, and Other Interests Under Section 363(f) of the Bankruptcy Code.**

40.    The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

sections 363(b) and 363(f) of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in *bona fide* dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f); *see also In re Byrd*, No. 01-25006, 2007 WL 1485441, at *14 (Bankr. D. Md. May 18, 2007) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

41.    The Debtors anticipate that, to the extent there are liens on the Store Closure Assets, all holders of such liens will consent to the Sales because they provide the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the repayment of amounts due to such parties.  Any and all liens on the Store Closure Assets sold under the Sales would attach to the remaining net proceeds of such sales with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest with respect thereto.

42.    Moreover, all identified lienholders will receive notice and will be given sufficient opportunity to object to the relief requested on a final basis.  Any such entity that does not object to the sale of the Store Closure Assets should be deemed to have consented.  *See In re GSC, Inc.*, 453 B.R. 132, 183 (Bankr. S.D.N.Y. 2011) ("Consent pursuant to section 363(f)(2) may be satisfied where an entity has not objected to a sale."); *In re Enron Corp.*, No. 01-16034, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)); *see also Futuresource LLC v. Reuters*

*Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." (internal citations omitted)); *Hargrave v. Twp. of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

43.    Accordingly, the Debtors submit that the sale of the Store Closure Assets satisfies the statutory requirements of section 365(f) of the Bankruptcy Code and should, therefore, be free and clear of any liens, claims, encumbrances, and other interests.  Courts in this district and other jurisdictions have granted similar relief in other bankruptcy cases under similar circumstances. *See e.g., In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Apr. 6, 2017) (permitting sales of closing store assets free and clear of liens and encumbrances); *In re Pawn Am., LLC*, No. 17-31145 (RJK) (Bankr. D. Minn. Apr., 14, 2017) (same); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (authorizing proposed liquidation and closing sales and deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

**IV.    The Court Should Waive Compliance With Applicable State Laws and Approve the Dispute Resolution Procedures.**

44.    The Debtors' ability to conduct the Sales in accordance with the Sale Guidelines and without complying with Applicable State Laws is critical to the Sales' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws

in conducting the Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales. Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated employees within a time frame that would be detrimental to the conduct of these chapter 11 cases, if not impossible.

45.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings.  As such, the Debtors believe the Sale Guidelines mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings, and therefore, the below requested relief is in compliance with any applicable Liquidation Sale Laws.

46.     The Debtors recognize that various Liquidation Sale Laws, including but not limited to state and local rules, laws, ordinances, and regulations that relate to permitting, licensing, bonding, waiting periods, time limits, bulk sale restrictions, and other related laws governing the conduct of store closing, liquidation, or other inventory clearance sales, may exist in certain states in which the Closing Stores are located.  Such Liquidation Sale Laws often provide that court-ordered liquidation sales are exempt from compliance therewith.

47.     In the event, however, that a Liquidation Law does not expressly waive compliance therewith of a court-supervised bankruptcy sale, the Debtors submit that such Liquidation Law should be deemed to be waived to the extent that it conflicts with section 363 of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Grp. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa.

27

1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997). Courts have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake, Inc., v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure). However, preemption is appropriate where the only state laws involved concern economic regulation rather than the protection of public health and safety. *See In re Baker & Drake, Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

48.     Here, the Sales are already subject to the Court's supervision. *See* 28 U.S.C. § 1334. Therefore, the Court is able to supervise the Sales and such supervision adequately protects the public interest and the Debtors' creditors. Moreover, section 363 requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, but compliance with Liquidation Sale Laws could constrain the Debtors' ability to marshal and maximize assets for the benefit of creditors. The Sales are a legitimate method by which the Debtors can maximize returns from the sale of the Store Assets for the benefit of their estates, their creditors, and their stakeholders, in accordance with the obligations under section 363 of the Bankruptcy Code.

49.     Therefore, to the extent that any Liquidation Sale Laws purport to interfere with the Sales, the Debtors seek authority to nevertheless proceed with the Sales without the necessity of, and the delay associated with, complying with such Liquidation Sale Laws (except health and

safety laws), which would otherwise require the Debtors to obtain various state licenses or permits, observe state and local waiting periods or time limits, and/or satisfy any additional requirements with respect to advertising or conducting the Sales, or transferring merchandise among the Debtors' various stores and distribution centers.

50.    Specifically, the Debtors submit that such Liquidation Sale Laws should be deemed inapplicable given the Court's supervision of the Sales.  The Debtors further request that no other person or entity, including (but not limited to) any governmental unit, including any federal, state, or local agency, department, or governmental authority, or any lessor be allowed to take any action to prevent, interfere with, or otherwise hinder the conduct of the Sales, including the advertisement and promotion of the Sales, as contemplated in the Consulting Agreement and in accordance with the Sale Guidelines.

51.    The Debtors propose that, to the extent that any governmental unit or other party, including a lessor associated with any Closing Store, seeks to dispute a Closing Sale at a Closing Store on the basis of one or more Liquidation Sale Laws, such party may serve a Liquidation Dispute Notice on the Debtors, in accordance with the Resolution Procedures described in this Motion and set forth in the Interim Order and the Final Order.

52.    Based on the foregoing, courts in this district and other jurisdictions have granted similar relief from Liquidation Sale Laws in other bankruptcy cases under similar circumstances. *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Apr. 6, 2017) (authorizing the store liquidation and closing sales while waiving compliance with laws affecting store closing or liquidation sales); *In re Pawn Am., LLC*, No. 17-31145 (RJK) (Bankr. D. Minn. Apr. 14, 2017) (same); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn. 2017)

(authorizing store closing sales while presuming compliance with laws affecting store closing or liquidation sales); *see also In re Brookstone Holdings Corp.*, No. 18-11780 (BLS) (Bankr. D. Del. Oct. 9, 2018) (same); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Mar. 8, 2018) (same).[7]

53.     Courts have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances.  *See, e.g.*, *In re Brookstone Holdings Corp.*, No. 18-11780 (BLS) (Bankr. D. Del. Oct. 9, 2018) (authorizing store closing sales and waiving compliance with any lease restrictions and deeming presumed compliance with "Fast Pay Laws"); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Mar. 8, 2018) (same); *In re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (authorizing store closing sales and deeming presumed compliance with "Fast Pay Laws"); *In re rue21, inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. July 11, 2017) (authorizing store closing sales and waiving compliance with any lease restrictions, sale laws, and "Fast Pay Laws"); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (Bankr. D. Del. Oct. 13, 2016) (granting relief from federal, state or local laws including "any fast pay laws" in connection with store closing sales); *In re Vestis Retail Grp, LLC*, No. 16- 10971 (LSS) (Bankr. D. Del. May 16, 2016) (authorizing the continuation of store closing sales, and applying dispute resolution procedures to the extent that federal, state, or local laws, or any Fast Pay Laws, would apply).[8]

## V.     The Court Should Waive Compliance With Any Restriction in the Leases.

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

54.     Certain of the Debtors' leases governing the premises of the stores subject to any Sales may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale); *see also Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); *In re R. H, Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

55.     Store closing sales are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts, despite provisions in recorded documents or agreements purporting to forbid such sales.  Indeed, courts have repeatedly deemed such restrictive contractual provisions unenforceable as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Gordmans Stores,*

*Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Apr., 6, 2017) (authorizing sale of certain of the debtors'

assets without requiring compliance with lease provisions affecting store closing or liquidation

sales); *see also In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017)

(same); *In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn. 2017) (authorizing

store closing sales without requiring compliance with lease provisions affecting store closing or

liquidation sales laws); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (Bankr.

S.D.N.Y. Mar. 2, 2017) (same); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6,

2016) (same).[9]

57.    Thus, to the extent that such provisions or restrictions exist in any of the leases of

the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors

and/or the Consultant to conduct any liquidation sales without interference by any landlords or

other persons affected, directly or indirectly, by the liquidation sales.

## VI.    The Court Should Approve the Abandonment of Certain Property In Connection With Any Liquidation Sales.

57.    Section 554 of the Bankruptcy Code provides that after notice and a hearing, a

debtor "may abandon any property of the estate that is burdensome to the estate or that is of

inconsequential value and benefit to the estate."  11 U.S.C. § 554(a); *see also Hanover Ins. Co.* v.

*Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) ("[A trustee] may abandon his claim to any

asset, including a cause of action, he deems less valuable than the cost of asserting that claim or

administering the property."); *In re Contract Research Sols., Inc.*, No. 12-11004 (KJC), 2013 WL

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

1910286, at *4 (Bankr. D. Del. May 1, 2013) ("[A debtor] need only demonstrate that [it] has exercised sound business judgment in making the determination to abandon").

58.     Here, in accordance with the Sale Guidelines and with the aid of the Consultant, the Debtors will make every reasonable effort to sell all Store Assets at the Closing Stores as quickly and efficiently as possible for the purpose of monetizing such assets and vacating the Closing Stores as soon as possible.  As noted above, the Debtors are seeking to liquidate Merchandise as well as FF&E (which the Debtors have determined is in their best interest to sell) located at each of the Closing Stores, in consultation with the Consultant.  However, during the course of the Sales, the Debtors may determine that the costs associated with the continued storage and sale efforts respecting certain FF&E is likely to exceed the projected proceeds that could be realized from the sale thereof, or that certain FF&E may have low prospects for resale.  In such event, any remaining FF&E would likely impose a financial burden on the estates, in the form of storage and removal costs, but are unlikely to provide much, if any, value in return to the estates (such remaining FF&E, the "Remaining Property").

59.     To maximize the value of the Debtors' assets and to minimize unnecessary costs to the estates, the Debtors respectfully request authority to designate any property located at the Closing Stores as Remaining Property and to abandon such Remaining Property located at any of the Closing Stores without incurring liability to any person or entity.  Before designating any assets as Remaining Property and/or abandoning any Remaining Property at any Closing Store, the Debtors will have determined in the exercise of their sound business judgment that such Remaining Property to be abandoned by the Debtors is either (a) burdensome to the estates because removal and storage costs for the Remaining Property are likely to exceed any net proceeds therefrom or (b) of inconsequential value and benefit to the estates.

33

60.     The Debtors will use all commercially reasonable efforts to remove, or cause to be removed, any confidential or personal identifying information (which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that constitute any FF&E or any Remaining Property before any such property is sold or abandoned.

61.     Accordingly, the Debtors respectfully request Court authority to designate and thereafter abandon Remaining Property if they determine that the benefits of retaining such property for storage or resale are greater than the costs of such retention.

**VII.    The Bankruptcy Court Should Approve the Procedures Relating to the Additional Closing Stores.**

62.     The Debtors request that the Sale Guidelines and the Final Order apply to any Additional Closing Stores.  In order to provide landlords and other parties in interest with information regarding the ultimate disposition of the Closing Stores, to the extent that the Debtors seek to conduct Sales at any Additional Closing Store, the Debtors will (a) first consult with the DIP ABL Agent and DIP Term Loan B Agent, (b) file the Additional Closing Store List, and (c) serve a notice of their intent to conduct the Sales at the Additional Closing Stores on the Additional Closing Store Landlords, any applicable Governmental Units, and any other interested parties by email (to the extent available to the Debtors) or overnight mail.  With respect to the Additional Closing Store Landlords, the Debtors will mail such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

34

63.    The Debtors propose that the Additional Closing Store Landlords and any interested parties shall have seven days after service of the applicable Additional Closing Store List to object to the application of the Interim Order or the Final Order, as applicable, to their Closing Stores.  If no timely objections are filed with respect to the application of the Interim Order or the Final Order, as applicable, to an Additional Closing Store, then the Debtors should be authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional Closing Store in accordance with the Interim Order or the Final Order, as applicable, the Sale Guidelines, and the Consulting Agreement.  If any objections are filed with respect to the application of the Interim Order or the Final Order, as applicable, to an Additional Closing Store, and such objections are not resolved, the objections and the application of the Interim Order or the Final Order, as applicable, to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary so that the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders.  Similar relief has been granted in recent retail bankruptcy cases.  *See, e.g.*, *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (approving similar procedures for supplemental stores); *In re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017); *In re rue21, inc.,* No. 17-22045 (Bankr. W.D. Pa. July 11, 2017) (same); *In re APP Winddown, LLC (f/k/a Am. Apparel, LLC)*, No. 16-12551 (Bankr. D. Del. Dec. 19, 2016) (same); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (same); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. June 28, 2013) (same).

**VIII.    The Court Should Find That Any Sale of the Store Closure Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman.**

64.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally identifiable information in the course of the Sales.  The Debtors intend to scrub all Store Assets to ensure that no confidential and personally identifiable information is transferred in connection with the sale of any such assets.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## Request for Waiver of Stay

65.    The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief sought herein is necessary for the Debtors to realize maximum return from the Sales and, ultimately, to preserve value for their estates and creditors.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## Reservation of Rights

66.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion;

36

(e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

## Notice

67.    The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; (j) all of the Debtors' landlords at the locations of the Stores; (k) all applicable state and consumer protection agencies; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

68.    No prior request for the relief sought in this Motion has been made to this or any other court.


*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and Final

Order granting the relief requested herein and such other relief as the Court deems appropriate

under the circumstances.

Dated:  January 16, 2019          /s/ *Michael T. Eversden*
  Omaha, Nebraska              James J. Niemeier (NE Bar No. 18838)
                                    Michael T. Eversden (NE Bar No. 21941)
                                    Lauren R. Goodman (NE Bar No. 24645)
                                    **MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
                                    First National Tower, Suite 3700
                                    1601 Dodge Street
                                    Omaha, Nebraska 68102
                                    Telephone:      (402) 341-3070
                                    Facsimile:      (402) 341-0216
                                    Email:          jniemeier@mcgrathnorth.com
                                                    meversden@mcgrathnorth.com
                                                    lgoodman@mcgrathnorth.com

                                    - and -

                                    James H.M. Sprayregen, P.C.
                                    Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
                                    Travis M. Bayer (*pro hac vice* pending)
                                    Jamie Netznik (*pro hac vice* pending)
                                    **KIRKLAND & ELLIS LLP**
                                    **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                    300 North LaSalle
                                    Chicago, Illinois 60654
                                    Telephone:      (312) 862-2000
                                    Facsimile:      (312) 862-2200
                                    Email:          james.sprayregen@kirkland.com
                                                    patrick.nash@kirkland.com
                                                    travis.bayer@kirkland.com
                                                    jamie.netznik@kirkland.com

                                    - and -

                                    Steven Serajeddini (*pro hac vice* pending)
                                    Daniel Rudewicz (*pro hac vice* pending)
                                    **KIRKLAND & ELLIS LLP**
                                    **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                    601 Lexington Avenue
                                    New York, New York 10022
                                    Telephone:      (212) 446-4800
                                    Facsimile:      (212) 446-4900
                                    Email:          steven.serajeddini@kirkland.com
                                                    daniel.rudewicz@kirkland.com

                                    *Proposed Co-Counsel to the Debtors*

## Exhibit A

**Consulting Agreement**



January 14, 2019

To:   Shopko Stores Operating Co., LLC ("Merchant")
      700 Pilgrim Way
      Green Bay, WI 54307

From: Gordon Brothers Retail Partners, LLC ("Consultant")
      800 Boylston Street, 27th Floor
      Boston, MA 02199

Re:   "Store Closing" Project

Ladies and Gentlemen:

        This letter shall serve as the agreement of Consultant and Merchant (the "Agreement") pursuant to which Consultant shall serve as the exclusive consultant to Merchant in connection with a "store closing" or other mutually agreed upon themed sale ("Sale") at certain of Merchant's (i) "Shopko Big Box Stores" (the "Big Box Stores"), and (ii) "Shopko Hometown Stores", "Shopko Express Stores", "Shopko Rx only Stores" and "Shopko Rx Store" (collectively subsection (ii), the "Hometown/Express Stores" and together with the Big Box Stores, the "Stores"), all as identified on <u>Exhibit A.</u>

## 1.   <u>RETENTION</u>

        Merchant hereby retains Consultant as its exclusive, independent consultant to conduct the Sale at the Stores during the Sale Term, and in connection therewith, Consultant shall, throughout the Sale Term:

     (i)     Recommend appropriate merchandise discounting, point-of-purchase, point-of-sale, and other internal and external advertising and signage, and merchandise presentation, in each case as necessary to effectively sell all of the Merchandise (as defined below) in accordance with a "store closing" or other mutually agreed upon themed sale.

     (ii)    Provide qualified supervisors with respect to the Stores to oversee the Sale process in the Stores.

     (iii)   Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale.

     (iv)   Recommend Sale-related customer service and housekeeping activities.

     (v)    Recommend Sale-related staffing levels for the Stores.

     (vi)   Recommend Sale-related loss prevention initiatives.

     (vii)  Assist Merchant to commence the Sale with a mutually agreed upon theme as may be approved (x) by the parties consistent with any required permitting or (y) in the event Merchant becomes subject to any chapter 11 proceeding (a "Bankruptcy Case") before any United States Bankruptcy Court (the "Bankruptcy Court"), by the Bankruptcy Court in any Approval Order

1

(as defined below).  In the event of the commencement of a Bankruptcy Case, as provided in Section 9 hereof Merchant agrees to seek, as part of its "first day hearing" or as soon as practicable thereafter, an Approval Order (defined below) in form and substance customary for such orders providing that compliance with such Approval Order shall be deemed compliance with Liquidation Sales Laws.

## 2.    SALE TERM; VACATING STORES; ADDING STORES

(A)    The "Sale Term" with respect to the Stores shall commence on the date identified on Exhibit B (the "Sale Commencement Date") and shall terminate no later than the date identified on Exhibit B ("Sale Termination Date"); provided, however, that the parties may fix a sooner or later Sale Termination Date (on a Store-by-Store basis at any one or more Stores) upon mutual written agreement (and in the case of a later Sale Termination Date, a mutually agreed upon revision to the budget for the "Consultant's Controlled Expenses"). Upon the conclusion of the Sale Term at the Stores, Consultant shall leave the Stores in broom-clean condition, subject to Consultant's right pursuant to Section 6 below to abandon in a neat and orderly manner all unsold Offered FF&E and all Retained FF&E in the event of a Bankruptcy Case.

(B)    After the date hereof, at the option of the Merchant, the Merchant may appoint the Consultant, and the Consultant may agree to serve, as the Merchant's exclusive independent consultant in connection with the conduct of sales at additional stores on mutually agreed upon terms and conditions, and the Approval Order shall provide a mechanism for same.

## 3.    EXPENSES

(A)    All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term (including without limitation all Consultant Controlled Expenses and all other store-level and corporate expenses associated with the Sale) shall be borne by Merchant; except solely for any of "Consultant's Controlled Expenses" that exceed the aggregate budgeted amount (as provided in Section 3(B) below) for such Consultant Controlled Expenses.

(B)    Attached hereto as Exhibit B is an expense budget for the "Consultant's Controlled Expenses" (including without limitation for advertising, signage, Consultant's Supervisor's fees/deferred fees/administrative fees and expenses, and miscellaneous expenses).  Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant therefor (up to the aggregate budgeted amount and not on a line-item basis) in connection with each weekly reconciliation contemplated by Section 5(C) upon presentation of reasonable documentation for such actually-incurred expenses.  Merchant shall be obligated to reimburse Consultant for Consultant Controlled Expenses in addition to all other fees/reimbursements/obligations contemplated hereunder.   In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement, including without limitation in the event of any Bankruptcy Case, with respect to obtaining entry of the Approval Order and/or negotiating any "side letters" with landlords of the Stores.

(C)    The parties may from time to time mutually agree in writing to increase the budget of Consultant's Controlled Expenses based upon circumstances of the Sale.

## 4.    CONSULTANT COMPENSATION

(A)    As used in this Agreement, the following terms shall have the following meanings:

(i)    "Cost Value" with respect to each item of Merchandise sold, shall be determined by reference to the lower of (1) the lowest per unit vendor cost in the File or in Merchant's books and records, maintained in the ordinary course consistent with historic practices; or (2) the Retail Price.

(ii) "Big Box Merchandise" shall mean all goods owned by Merchant that are sold from the Big Box Stores during the Sale Term (including without limitation goods in the Big Box Stores as of the Sale Commencement Date and "direct service delivery" goods arriving in the Big Box Stores and sold from the Big Box Stores during the Sale Term), the aggregate amount of which shall be determined using the gross rings inventory taking method.

(iii) "File" shall mean any of Merchant's inventory files delivered to Consultant during its diligence prior to the date hereof through Sale Commencement Date.

(iv) "Gross Big Box Proceeds" shall mean the sum of the gross proceeds of all sales of Merchandise made in the Big Box Stores (including as a result of the redemption of any gift card, gift certificate, or merchandise credit) during the Sale Term, net only of sales taxes.

(v) "Gross Hometown/Express Proceeds" shall mean the sum of the gross proceeds of all sales of Merchandise made in the Hometown/Express Stores (including as a result of the redemption of any gift card, gift certificate, or merchandise credit) during the Sale Term, net only of sales taxes.

(vi) "Gross Proceeds" shall mean the sum of Gross Big Box Proceeds and Gross Hometown/Express Proceeds.

(vii) "Gross Big Box Recovery Percentage" shall mean the Gross Big Box Proceeds divided by the sum of the aggregate Cost Value of all of the Big Box Merchandise.

(viii) "Gross Hometown/Express Recovery Percentage" shall mean Gross Hometown/Express Proceeds divided by the sum of the aggregate Cost Value of all of the Hometown/Express Merchandise.

(ix) "Hometown/Express Merchandise" shall mean all goods owned by Merchant that are sold from the Hometown/Express Stores during the Sale Term (including without limitation goods in the Hometown/Express Stores as of the Sale Commencement Date and "direct service delivery" goods arriving in the Stores and sold from the Big Box Stores during the Sale Term), the aggregate amount of which shall be determined using the gross rings inventory taking method.

(x) "Non-Merchandise Goods" shall mean (1) goods that belong to sublessees, licensees, or concessionaires of Merchant; (2) damaged of defective merchandise that cannot be sold; or (3) goods held by Merchant on memo, on consignment, or as bailee.

(xi) "Retail Price" shall mean with respect to each item of Merchandise sold, the lower of the lowest ticketed, marked, shelf, stickered, hang-tag, or File price.

(B)    Merchant shall pay Consultant a "Merchandise Fee" equal to the sum of (i) the amount based upon one of the following thresholds of Gross Big Box Recovery Percentage plus (ii) the amount based upon one of the following thresholds of Gross Hometown/Express Recovery Percentage (e.g., in each case of (i) and (ii), back to first dollar):

3

| Gross Big Box Recovery Percentage | Merchandise Fee (Big Box) |
|---|---|
| Below 128.00% | 1.00% of Gross Big Box Proceeds |
| Between 128.00% to 130.99% | 1.25% of Gross Big Box Proceeds |
| Between 131.00% to 132.99% | 1.50% of Gross Big Box Proceeds |
| Between 133.00% to 134.99% | 1.75% of Gross Big Box Proceeds |
| Between 135.00% to 137.99% | 2.00% of Gross Big Box Proceeds |
| Above 138.00% | 2.25% of Gross Big Box Proceeds |

| Gross Hometown/Express Recovery Percentage | Merchandise Fee (Hometown/Express) |
|---|---|
| Below 110.00% | 1.25% of Gross Hometown/Express Proceeds |
| Between 110.00% to 112.99% | 1.50% of Gross Hometown/Express Proceeds |
| Between 113.00% to 115.99% | 1.75% of Gross Hometown/Express Proceeds |
| Between 116.00% to 117.99% | 2.00% of Gross Hometown/Express Proceeds |
| Between 118.00% to 119.99% | 2.25% of Gross Hometown/Express Proceeds |
| Above 120.00% | 2.50% of Gross Hometown/Express Proceeds |

(C)     Subject to the consent of the owners of the Non-Merchandise Goods, Consultant shall sell Non-Merchandise Goods during the Sale at the Stores, and in consideration of such services, Consultant shall earn a fee equal to the definitive Merchandise Fee percentage earned by Consultant on sales of Big Box Merchandise and Hometown/Express Merchandise, respectively, as set forth in Section 4(B) above multiplied by the aggregate gross proceeds, net only of sales taxes, from the sale of Non-Merchandise Goods at the Big Box Stores and Hometown/Express Stores, respectively (together, the "Non-Merchandise Fee").

(D)     For purposes of calculating Gross Proceeds, Gross Big Box Recovery Percentage, Gross Hometown/Express Recovery Percentage, and the Consultant's Merchandise Fee and Non-Merchandise Fee, the parties shall use the "Gross Rings" method, wherein Consultant and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the Cost Value and Retail Price (as reflected on Merchant's books and records) for such item, and the markdown or other discount granted in connection with such sale. All such records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

(E)     Merchant shall pay Consultant an amount equal to (i) 1.00% of Gross Big Box Proceeds plus 1.25% of Gross Hometown/Express Proceeds on account of the prior week's sales as an advance on account of the Merchandise Fee weekly plus any Non-Merchandise Fee and FF&E Commission (as defined below) earned during the prior week (as part of each weekly reconciliation contemplated by Section 5(B) below), subject to final confirmation and any necessary corrections as part of the Final Reconciliation. The parties shall determine the definitive Gross Big Box Recovery Percentage, Gross Hometown/Express Recovery Percentage, Merchandise Fee, Non-Merchandise Fee, and FF&E Commission (and in the case of Merchant, any Additional Consultant Goods Fee, if any,) in connection with the Final Reconciliation. Immediately thereafter (and as part of the Final Reconciliation), Merchant or Consultant, as the case may be, shall pay any additional amount owed on account of such fees.

## 5.    CONDUCT OF SALE; OTHER SALE MATTERS

(A)     Merchant shall have sole control over the personnel in the Stores. Merchant shall have sole control over the cash, debit and charge card payments for all Merchandise sold during the Sale Term in accordance with Merchant's normal cash management procedures, subject to Consultant's right to audit any such items in the event of a good faith dispute as to the amount thereof.

(B)     The parties will meet (in person or by phone) on each Tuesday (or such other mutually agreed upon date on a weekly basis) during the Sale Term to review any Sale matters reasonably requested by either party; and all amounts payable or reimbursable to Consultant for the prior week (or the partial week in the case of the first and last weeks) shall be reconciled and paid immediately thereafter. No later than fifteen (15) days following the end of the Sale, the parties shall complete a final reconciliation and settlement of all amounts contemplated by this Agreement ("Final Reconciliation"), including without limitation a final determination and payment of (i) any remaining reimbursements to Consultant; (ii) any amounts remaining due on account of the Merchandise Fee or Non-Merchandise Fee; and (iii) any amounts due on account of the FF&E Commission. From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request. Each party to this Agreement shall, at all times during the Sale Term and during the one (1) year period thereafter, provide the other with access to all information, books and records relating to the Sale and to this Agreement. All records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

(C)     Merchant shall solely be responsible for calculating, collecting, handling, reporting, and remitting all sales taxes associated with the sale of Merchandise and Additional Consultant Goods during the Sale Term in accordance with applicable law, and Consultant shall have absolutely no responsibility whatsoever for such obligations, except as otherwise provided in this Agreement.

(D)     Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale, and to maximize the net recovery from the Sale, Merchant acknowledges that Consultant is not guaranteeing any results of the Sale. Merchant further acknowledges that the parties are not conducting an inventory of the Merchandise to be included in the Sale (and that Consultant has made no independent assessment of the beginning levels of such Merchandise) and Consultant shall not bear any liability for shrink or other loss to any Merchandise.

(E)     To the extent Merchant has informed Consultant in writing (with reasonable specificity and prior to the execution of this Agreement) of any rules relating to its employees or lease requirements in the Stores that are the subject of the Sale, Consultant shall adhere to such rules.

(F)     All sales of Merchandise in the Stores during the Sale shall be made in the name, and on behalf, of Merchant. All such sales shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same. Consultant shall, during the Sale Term at the Stores, cooperate with Merchant in respect of Merchant's procedures governing returns of goods otherwise sold by Merchant (e.g., not in the Stores during the Sale Term).

(G)     The Sale will be advertised as a "store closing" or similar themed sale; and Merchant shall provide Consultant with the right to use signs and internal and external banners and signwalkers reflecting this message without interruption by any person.

(H)     In each case solely for purposes in furtherance of the Sale, Merchant shall provide to Consultant, at no cost to Consultant, with: (i) the right of access to the Stores; (ii) central and distribution center services ordinarily provided to the Stores by Merchant; (iii) the use of Merchant's employees (in quantities consistent with historical periods); and (iv) all Store-level and intellectual property assets of the Merchant and the Stores (including, but not limited to, trade names, logos, customer lists (including email lists), social networking sites, computer hardware and software, and furniture, fixtures and equipment).

(I)     Prior to the commencement of a Bankruptcy Case, Consultant shall advise Merchant with respect to any federal, state or local statute, ordinance, rule or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale, and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that contain exemptions for court-ordered sales (collectively, the "Liquidation Sale Laws"). In connection with such obligation prior to the

5

commencement of a Bankruptcy Case, Consultant will (i) advise Merchant of any applicable waiting period under the Liquidation Sale Laws, and/or (ii) prepare (in Merchant's name and for Merchant's signature) all licensing paperwork as may be necessary under such Liquidation Sale Laws, deliver all such paperwork to Merchant, and file, on behalf of Merchant, all such paperwork where necessary, and/or (iii) advise where licensing paperwork and/or waiting periods do not apply. Following the commencement of a Bankruptcy Case, the Approval Order shall provide that the Merchant and Consultant shall each be presumed to be in compliance with any Liquidation Sale Laws and shall be authorized to conduct the Sale in accordance with the terms of the Approval Order without the necessity of showing compliance with any Liquidation Sale Laws; provided, that at all times Merchant and Consultant shall conduct the Sale (and the Existing Sales) in accordance with the terms of the Approval Order and any with laws and regulations of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").

(J)     The parties may, each in their respective sole discretions and subject to (i) the terms of this Agreement and (ii) the Approval Order, later agree to allow Consultant to supplement the Merchandise in the Stores during the Sale Term with goods procured by Consultant that are of like kind and quality as the Merchandise ("Augmentation Program"). The terms and conditions of the Augmentation Program shall be as the parties (each in their respective sole discretions) may mutually agree in writing, including, without limitation, as to the sharing of expenses and proceeds therefrom, and as to the nature and extent of Uniform Commercial Code and similar security to be taken by Consultant in connection with the Augmentation Program. In the course of implementing any such Augmentation Program, it shall be the responsibility of the Consultant to ensure that such Augmentation Program is permitted by, and complies with, the Approval Order; provided, that the Approval Order shall include language customary to such orders providing that compliance with such Approval Order shall be deemed compliance with Liquidation Sales Laws.

(K)     The parties have agreed that they will discuss the extent to which, if at all, Merchant wishes to engage Consultant to also provide a suite of customer transition strategies to assist Merchant in transitioning Store customers to Merchant's other stores, ecommerce platforms, and other selling channels. In connection with such discussions, the parties will consider, among other things, the scope of such transition strategies to be provided and the expenses associated therewith. Notwithstanding the foregoing, neither party shall have any obligation to the other in connection with such additional services unless and until the parties (in their respective sole discretions) enter into a subsequent written agreement.

(L)     Concurrently with the execution of, and as a condition to Consultant's obligations under, this Agreement, Merchant shall fund to Consultant $264,432.00 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Agreement prior to the Final Reconciliation). Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement and/or the Existing Consulting Agreements. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement and/or the Existing Consulting Agreements shall be returned to Merchant within three days following the Final Reconciliation.

(M)     (i)     In connection with the Sale, and subject to compliance with applicable law, Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores at Consultant's sole expense (including labor, freight and insurance relative to shipping such Additional Consultant Goods to the Stores). Sales of Additional Consultant Goods shall be run through Merchant's cash register systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Merchant

6

shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchant goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent Merchant's written consent, and Consultant's agreement to reimburse Merchant for any associated expenses, Consultant shall not use Merchant's distribution centers for any Additional Consultant Goods. In any sale of Additional Consultant Goods as described above, it shall be the responsibility of the Consultant to ensure that such sale is implemented in accordance with the terms of this Agreement and the Approval Order; provided, that the Approval Order shall include language customary to such orders providing that compliance with such Approval Order shall be deemed compliance with Liquidation Sales Laws; provided, further, that Merchant and Consultant shall comply with any applicable General Laws.

(ii)    Consultant shall pay to Merchant an amount equal to ten percent (10.0%) of the gross proceeds (excluding sales taxes) from the sale of the Additional Consultant Goods (the "Additional Consultant Goods Fee"), and Consultant shall retain all remaining amounts from the sale of the Additional Consultant Goods. Consultant shall pay Merchant its Additional Consultant Goods Fee in connection with each weekly sale reconciliation with respect to sales of Additional Consultant Goods sold by Consultant during each then prior week (or at such other mutually agreed upon time).

(iii)    Consultant and Merchant intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Merchant in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to Merchant the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.

(iv)    Merchant shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

(v)    Merchant acknowledges that the Additional Consultant Goods shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC"). Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds less the Additional Consultant Goods Fee, and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties.

6.    **FF&E**

(A)    Promptly following the Sale Commencement Date, Merchant shall inform Consultant of those items of furniture, fixtures, and equipment located at the Stores which are not to be sold (because Merchant does not have the right to sell such items, because Merchant wishes to retain such items for itself, or otherwise) (collectively, "Retained FF&E").

(B)    With respect to all furniture, fixtures, and equipment located at the Stores as of the Sale Commencement Date which is not Retained FF&E (collectively the "FF&E"), Consultant shall have the right to sell such FF&E during the Sale Term on a commission basis equal to twelve and one-half percent (12.5%) of the gross sales of FF&E net only of sales tax ("FF&E Commission").

(C)    Merchant shall reimburse Consultant for its reasonable sale expenses associated with the sale of FF&E, not to exceed the amount shown on an FF&E expense budget to be mutually and reasonably agreed to by the parties promptly after the identification/designation of the FF&E and Retained FF&E ("FF&E Expenses").

(D)    Consultant shall remove any unsold FF&E (and any Retained FF&E) at the Stores at the conclusion of the Sale Term as directed by Merchant, subject to Merchant's obligation to reimburse any expenses incurred by Consultant in connection therewith, pursuant to the mutually agreed upon budget contemplated by Section 6(C) hereof, and further provided, that Consultant shall not have any obligation or responsibility whatsoever to cap any electrical or plumbing outlets or purchase, sell, make, store, handle, treat, dispose, or remove any hazardous materials (including without limitation Freon) in connection with its agency related to the FF&E (the full responsibility of which shall remain with the Merchant whether or not FF&E containing such hazardous materials is or is not sold).

(E)    In the event of the Bankruptcy Case, and notwithstanding the foregoing paragraph, Consultant may abandon any unsold FF&E and any Retained FF&E.

## 7.    **INSURANCE; RISK OF LOSS**

During the Sale Term: (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b) each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage. Each party shall use commercially reasonable efforts to have: (a) the other party named as an additional insured on all such insurance of the other party; (b) all such insurance be non-cancelable and non-changeable except upon 30 days' prior written notice to the other party; and (c) certificates of all such insurance delivered to the other party as soon as practicable following the execution of this Agreement.

Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that (i) Consultant shall not be deemed to be in possession or control of the Stores or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) Consultant does not assume any of Merchant's obligations or liabilities with respect to any of the matters addressed in subsection (i) above. This paragraph shall not limit Consultant's indemnification rights as set forth in Section 8(A) below.

Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores, and Merchandise sold in the Stores, before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct or unlawful acts of Consultant.

## 8.    **INDEMNIFICATION**

(A)    Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

(i)    Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives;

(iii)    the negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives;

8

(iv)   the failure to comply with any applicable Liquidation Sales Laws (except to the extent such compliance with exempted under the Approval Order), or any consumer warranty or products liability claims arising out of or related to (a) the sale of Additional Consultant Goods or (b) any Augmentation Program; or

(v)   Consultant's failure to conduct the Sale in compliance with any applicable General Laws.

(B)   Merchant shall indemnify and hold Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

(i)   Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)   any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement, except where due to the negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives;

(iii)   any consumer warranty or products liability claims relating to any Merchandise;

(iv)   any claim relating to the compromise of any customer personally identifiable information;

(v)   the negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives; and/or

(vi)   if applicable, any proceedings before the Bankruptcy Court or any other court of competent jurisdiction regarding this Agreement, including obtaining approval thereof and/or defending against any objection thereto.

## 9.   MISCELLANEOUS

(A)   In the event of a Bankruptcy Case, this Agreement (together with those certain other consulting agreements between Merchant and Consultant dated: September 24, 2018 (7 stores); October 31, 2018 (Jacksboro store); December 5, 2018 (39 stores); and December 18, 2018 (6 stores)(collectively, the "Existing Consulting Agreements"; and such sales pursuant thereto, the "Existing Sales")), including retention of Consultant and conduct of the Sale and Existing Sales set forth herein and therein, shall be subject to the approval of the Bankruptcy Court. Merchant shall promptly seek to have this Agreement and the Existing Consulting Agreements, and the transactions contemplated by this Agreement and the Existing Consulting Agreements approved by the Bankruptcy Court pursuant to sections 363 and 365 of the United States Bankruptcy Code (and not pursuant to sections 327, 328, 330, or 331 thereof) and an order (the "Approval Order") with terms acceptable to both Merchant and Consultant that provides, among other things, as follows:

(i)   the payment of all fees and reimbursement of expenses hereunder and under the Existing Consulting Agreements to Consultant is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances;

(ii)   all such payments of fees and reimbursement of expenses under this Agreement and the Existing Consulting Agreements shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement and the Existing Consulting Agreements;

(iii)   approval of the transaction contemplated hereby;

(iv)   authorizing the Sale and the Existing Sales without the necessity of complying with Liquidation Sale Laws that could otherwise govern the Sale and the Existing Sales) to the extent provided in the Approval Order;

9

      (v)     authorizing the Sale and the Existing Sales) notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the Existing Sales or the necessity of obtaining any third party consents to the extent permissible by the Bankruptcy Code and otherwise provided in the Approval Order or such other order(s) as may be entered by the Bankruptcy from time to time;

      (vi)    authorizing the sale of Additional Consultant Goods and granting Consultant a first priority senior security interest and lien upon the Additional Consultant Goods and proceeds thereof as provided herein; and

      (vii)   take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement; and

      (viii)  including authority for the Merchant to pay Consultant's fees and expenses under this Agreement and the Existing Consulting Agreements as part of the Approval Order without further action by the Bankruptcy Court.

In such event, any legal action, suit or proceeding arising in connection with this Agreement or the Existing Consulting Agreements shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the Approval Order, Consultant shall conduct the Sale and the Existing Sales in accordance with the terms of the Approval Order in all material respects. In the event the Approval Order is not entered by the Bankruptcy Court or does not include the terms and conditions contained herein, (i) Merchant shall reimburse Consultant for any Consultant Controlled Expenses incurred in connection with the Sale or the Existing Sales through and including the day immediately after denial of such motion by the Bankruptcy Court; and (ii) Consultant may, in its sole discretion, elect to terminate this Agreement and the Existing Consulting Agreements upon ten (10) days written notice to Merchant. The Bankruptcy Court shall have exclusive jurisdiction to resolve any issues arising under this Agreement. Further in the event of a Bankruptcy Case, and upon disclosure to Merchant in advance thereof, Consultant shall have the right to form a contractual joint venture with additional entities to serve as "Consultant" hereunder as to this Agreement.

      (B)     This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto. This Agreement may not be modified except in a written instrument executed by each of the parties hereto. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder. Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed. Each of Consultant and Merchant shall comply with all federal, state and local laws, rules and regulations applicable to them in connection with the transactions contemplated by this Agreement. This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns; provided, however, that this Agreement may not be assigned by either party without the prior written consent of the other. Written notices contemplated by this Agreement shall be sent by email (i) if to Merchant c/o Susan Buckna at Susan.Buckna@shopko.com ; and (ii) if to Consultant c/o Mackenzie Shea at mshea@gordonbrothers.com

**[Signature Page Follows]**

Very truly yours,

**Gordon Brothers Retail Partners, LLC**

By:

Name: Richard Edwards
Title: Co-President - Retail

Agreed and Accepted:

**Shopko Stores Operating Co., LLC**

By:

Name:  Gary L. Gibson
Title:   Vice President, Treasurer
Date:   January 14, 2019

Exhibits:

A     Stores
B     Budget of Consultant Controlled Expenses

2434399.2
2434511.2

11

Shoppko
Exhibit A

**Store List**

| Store No. | Banner | Store | Address | City | State | Zip Code | Telephone No. | Phase |
|---|---|---|---|---|---|---|---|---|
| 1 | Big Box | Green Bay W | 216 S. Military Ave. | Green Bay W | WI | 54303 | 920-494-3415 | Phase 4 |
| 3 | Big Box | Manitowoc | 3415 Calumet Ave. | Manitowoc | WI | 54220 | 920-684-0255 | Phase 4 |
| 5 | Big Box | De Pere | 230 North Wisconsin Street | De Pere | WI | 54115 | 920-336-3101 | Phase 5 |
| 15 | Big Box | Appleton | 1000 West Northland Ave | Appleton | WI | 54914 | 920-731-8181 | Phase 4 |
| 18 | Big Box | West Bend | 1710 S. Main St. | West Bend | WI | 53095 | 262-338-6131 | Phase 4 |
| 20 | Big Box | La Crosse N | 2400 Rose Street | La Crosse N | WI | 54603 | 608-781-3400 | Phase 3 |
| 23 | Big Box | Hutchinson | 125 Main Street N | Hutchinson | MN | 55350 | 320-587-4994 | Phase 5 |
| 29 | Big Box | Madison W | 7401 Mineral Point Rd. | Madison W | WI | 53717 | 608-833-8600 | Phase 4 |
| 32 | Big Box | Monona | 2101 West Broadway | Monona | WI | 53713 | 608-222-6010 | Phase 4 |
| 33 | Big Box | Menasha | 1578 Appleton Rd | Menasha | WI | 54952 | 920-722-8166 | Phase 3 |
| 35 | Big Box | Rochester S | 2820 Hwy 63 South | Rochester S | MN | 55904 | 507-281-0686 | Phase 4 |
| 39 | Big Box | Lincoln S | 4200 South 27Th Street | Lincoln S | NE | 68502 | 402-421-2220 | Phase 4 |
| 45 | Big Box | Bellevue | 601 Galvin Road South | Bellevue | NE | 68005 | 402-293-1805 | Phase 4 |
| 47 | Big Box | Lincoln N | 100 South 66Th Street | Lincoln N | NE | 68510 | 402-489-3887 | Phase 4 |
| 53 | Big Box | North Platte | 510 East Philip Ave. | North Platte | NE | 69101 | 308-534-2441 | Phase 4 |
| 56 | Big Box | Omaha | 14445 West Center Road | Omaha | NE | 68144 | 402-333-9003 | Phase 4 |
| 63 | Big Box | Pocatello | 4215 Yellowstone Ave | Pocatello | ID | 83202 | 208-237-6610 | Phase 5 |
| 64 | Big Box | Nampa | 2100 Caldwell Blvd. | Nampa | ID | 83651 | 208-466-8984 | Phase 4 |
| 66 | Big Box | Spokane | 9520 N Newport Hwy | Spokane | WA | 99218 | 509-466-2449 | Phase 5 |
| 76 | Big Box | Sioux Falls I | 1601 W. 41St St | Sioux Falls I | SD | 57105 | 605-338-1118 | Phase 5 |
| 78 | Big Box | Rapid City | 1845 Haines Ave | Rapid City | SD | 57701 | 605-342-1551 | Phase 5 |
| 80 | Big Box | Madison Iv | 2201 Zeier Rd. | Madison Iv | WI | 53704 | 608-246-0700 | Phase 4 |
| 81 | Big Box | Yakima | 5801 Summit View Ave | Yakima | WA | 98908 | 509-965-6236 | Phase 3 |
| 82 | Big Box | Murray | 5959 South State Street | Murray | UT | 84107 | 801-261-0500 | Phase 3 |
| 84 | Big Box | West Jordan | 1553 West 9000 S | West Jordan | UT | 84088 | 801-255-5100 | Phase 4 |
| 87 | Big Box | Ogden | 1018 Washington Boulevard | Ogden | UT | 84404 | 801-393-2200 | Phase 4 |
| 88 | Big Box | Layton | 1150 North Main | Layton | UT | 84041 | 801-546-0700 | Phase 5 |
| 89 | Big Box | Walla Walla | 1651 West Rose Street | Walla Walla | WA | 99362 | 509-525-8733 | Phase 5 |
| 92 | Big Box | Kennewick | 867 North Columbia Center Blvd | Kennewick | WA | 99336 | 509-736-0884 | Phase 5 |
| 93 | Big Box | Bend | 60 Ne Bend River Mall Ave | Bend | OR | 97703 | 541-382-2121 | Phase 4 |
| 95 | Big Box | Boise Ii | 2655 South Broadway Ave | Boise Ii | ID | 83706 | 208-345-8723 | Phase 3 |
| 96 | Big Box | Redding | 55 Lake Boulevard | Redding | CA | 96003 | 530-241-0415 | Phase 5 |
| 97 | Big Box | West Valley | 4850 West 3500 South | West Valley | UT | 84120 | 801-966-8500 | Phase 4 |
| 98 | Big Box | Eugene Ii | 2815 Chad Drive | Eugene Ii | OR | 97408 | 541-485-7443 | Phase 5 |
| 100 | Big Box | Neenah | 699 S Green Bay Road | Neenah | WI | 54956 | 920-751-0250 | Phase 4 |
| 101 | Big Box | Sioux Falls Ii | 4501 East Arrowhead Parkway | Sioux Falls Ii | SD | 57110 | 605-335-8822 | Phase 4 |
| 102 | Big Box | Marinette | 2741 Roosevelt Road | Marinette | WI | 54143 | 715-735-0250 | Phase 4 |
| 104 | Big Box | Brigham City | 747 South Main | Brigham City | UT | 84302 | 435-723-1400 | Phase 4 |
| 108 | Big Box | Spanish Fork | 955 North Main Street | Spanish Fork | UT | 84660 | 801-798-7381 | Phase 4 |
| 109 | Big Box | Riverdale | 4060 Riverdale Road | Riverdale | UT | 84405 | 801-392-5300 | Phase 4 |
| 111 | Big Box | Salem | 1230 Lancaster Drive Se | Salem | OR | 97317 | 503-371-6410 | Phase 5 |
| 127 | Big Box | Delavan | 1450 East Geneva Street | Delavan | WI | 53115 | 262-728-0080 | Phase 5 |
| 134 | Big Box | Pullman | 1450 South Grand Ave. | Pullman | WA | 99163 | 509-332-0220 | Phase 5 |
| 139 | Big Box | Quincy | 3200 Broadway | Quincy | IL | 62301 | 217-224-2355 | Phase 5 |
| 142 | Big Box | Fort Madison | 4810 Avenue O | Fort Madison | IA | 52627 | 319-372-4217 | Phase 4 |
| 170 | Big Box | Rhinelander | 2200 Lincoln Street | Rhinelander | WI | 54501 | 715-362-3900 | Phase 4 |
| 171 | Big Box | Plover | 1800 Plover Road | Plover | WI | 54467 | 715-342-8974 | Phase 4 |
| 175 | Big Box | Lincoln | 6845 South 27Th Street | Lincoln | NE | 68512 | 402-420-9400 | Phase 4 |
| 178 | Big Box | Sussex | N 66 W 25201 County Vv | Sussex | WI | 53089 | 262-820-2563 | Phase 3 |
| 201 | Hometown | Emmetsburg | 3402 Main Street | Emmetsburg | IA | 50536 | 712-415-1448 | Phase 5 |
| 211 | Hometown | Estherville | 2402 Central Ave. | Estherville | IA | 51334 | 712-362-0330 | Phase 3 |
| 215 | Express | Shawano | 100 County Rd B | Shawano | WI | 54166 | 715-526-3456 | Phase 5 |
| 501 | Express | Ledgeview | 3705 Monroe Road | Ledgeview | WI | 54115 | 920-336-6096 | Phase 5 |
| 502 | Express | Howard | 2585 Lineville Road | Howard | WI | 54313 | 920-662-9450 | Phase 5 |
| 503 | Express | Port Washington | 1011 N Wisconsin Street | Port Washington | WI | 53074 | 262-284-3436 | Phase 5 |
| 512 | Hometown | Ellsworth | 598 Lucas Lane | Ellsworth | WI | 54011 | 715-273-4278 | Phase 5 |
| 528 | Express | Roundup | 148 Main Street | Roundup | MT | 59072 | 406-323-1811 | Phase 5 |
| 529 | Express | Dillon | 125 East Glendale | Dillon | MT | 59725 | 406-683-2316 | Phase 5 |

Shopko
Exhibit A

**Store List**

| Store No. | Banner | Store | Address | City | State | Zip Code | Telephone No. | Phase |
|---|---|---|---|---|---|---|---|---|
| 534 | Hometown | Rolla | 602 Main Avenue West | Rolla | ND | 58367 | 701-953-5048 | Phase 4 |
| 536 | Hometown | Ulysses | 515 East Oklahoma Avenue | Ulysses | KS | 67880 | 620-424-4365 | Phase 4 |
| 537 | Hometown | Beloit | 1026 N. Independence Avenue | Beloit | KS | 67420 | 785-738-6521 | Phase 4 |
| 543 | Hometown | Wolf Point | 600 Us Highway 2E | Wolf Point | MT | 59201 | 406-653-3980 | Phase 3 |
| 546 | Hometown | Burlington | 333 S. Lincoln | Burlington | KS | 80807 | 719-346-6085 | Phase 3 |
| 546 | Hometown | Burlington | 333 S. Lincoln | Burlington | IA | 80807 | 719-346-6085 | Phase 4 |
| 546 | Hometown | Burlington | 333 S. Lincoln | Burlington | CO | 80807 | 719-346-6085 | Phase 4 |
| 549 | Hometown | Hardin | 1001 N. Center Avenue | Hardin | MT | 59034 | 406-623-5147 | Phase 5 |
| 556 | Hometown | Prosser | 471 Wine Country Road | Prosser | WA | 99350 | 509-786-0205 | Phase 5 |
| 559 | Hometown | Orofino | 429 Michigan Ave | Orofino | ID | 83544 | 208-476-5727 | Phase 5 |
| 561 | Hometown | Cokato | 145 Broadway Avenue N | Cokato | MN | 55321 | 320-559-0203 | Phase 5 |
| 566 | Hometown | Warroad | 216 Main Avenue Ne | Warroad | MN | 56763 | 218-386-4853 | Phase 4 |
| 574 | Hometown | Lowell | 2052 E Commercial Ave | Lowell | IN | 46356 | 219-690-1212 | Phase 4 |
| 587 | Hometown | Clarinda | 1180 S 16Th St | Clarinda | IA | 51632 | 712-850-1320 | Phase 4 |
| 594 | Hometown | Chamberlain | 1951 E King Ave | Chamberlain | SD | 57325 | 605-234-1512 | Phase 3 |
| 600 | Hometown | Vinton | 911 S K Ave | Vinton | IA | 52349 | 319-472-4432 | Phase 3 |
| 601 | Hometown | Kewaunee | 802 N. Main Street | Kewaunee | WI | 54216 | 920-388-2915 | Phase 5 |
| 606 | Hometown | Calumet | 56835 Station Drive | Calumet | MI | 49913 | 906-337-2698 | Phase 5 |
| 607 | Hometown | Seymour | 1010 South Mainline Dr | Seymour | WI | 54165 | 920-833-2141 | Phase 3 |
| 608 | Hometown | Brillion | 1010 W. Ryan Street | Brillion | WI | 54110 | 920-756-2640 | Phase 5 |
| 609 | Hometown | Kiel | 1120 S.T.H. 67 | Kiel | WI | 53042 | 920-894-3604 | Phase 5 |
| 611 | Hometown | St Peter | 1002 Old Mn Ave | St Peter | MN | 56082 | 507-931-4410 | Phase 5 |
| 613 | Hometown | Winneconne | 946 E. Main Street | Winneconne | WI | 54986 | 920-582-4414 | Phase 5 |
| 622 | Hometown | Wetmore | E 9916 M28 East | Wetmore | MI | 49895 | 906-387-2525 | Phase 3 |
| 624 | Hometown | L'Anse | 15900 Picture Bay Trail | L'Anse | MI | 49946 | 906-524-2424 | Phase 5 |
| 635 | Hometown | Savanna | 251 S. 4Th Street | Savanna | IL | 61074 | 815-273-3556 | Phase 5 |
| 639 | Hometown | Rockville | 840 North U.S. 41 | Rockville | IN | 47872 | 765-569-6220 | Phase 3 |
| 642 | Hometown | Allegan | 540 Jenner Drive | Allegan | MI | 49010 | 269-686-9465 | Phase 4 |
| 650 | Hometown | Dowagiac | 56419 Pokagon Street | Dowagiac | MI | 49047 | 269-782-5444 | Phase 3 |
| 659 | Hometown | Auburn | 2410 Dahlke Ave. | Auburn | NE | 68305 | 402-274-4974 | Phase 5 |
| 661 | Hometown | West Point | 500 Plaza Drive | West Point | NE | 68788 | 402-372-5343 | Phase 5 |
| 662 | Hometown | Plattsmouth | 211 S. 23Rd Street | Plattsmouth | NE | 68048 | 402-296-5252 | Phase 3 |
| 665 | Hometown | Hampton | 808 4Th St. Southeast | Hampton | IA | 50441 | 641-456-4891 | Phase 4 |
| 676 | Hometown | Chariton | 1901 Court Avenue | Chariton | IA | 50049 | 641-774-2168 | Phase 4 |
| 677 | Hometown | Onawa | 2220 Hwy 175 West | Onawa | IA | 51040 | 712-423-3683 | Phase 4 |
| 681 | Hometown | Ida Grove | 202 Susan Lawrence Drive | Ida Grove | IA | 51445 | 712-364-3197 | Phase 5 |
| 683 | Hometown | Audubon | 109 N. Market Street | Audubon | IA | 50025 | 712-563-2066 | Phase 5 |
| 684 | Hometown | Bloomfield | 106 Smith Street | Bloomfield | IA | 52537 | 641-664-2052 | Phase 4 |
| 687 | Hometown | Greenfield | 202 Sw. Kent | Greenfield | IA | 50849 | 641-743-6383 | Phase 5 |
| 688 | Hometown | Missouri Valley | 413 W Huron Street | Missouri Valley | IA | 51555 | 712-642-5292 | Phase 5 |
| 689 | Hometown | Mount Ayr | 201 N. Fillmore | Mount Ayr | IA | 50854 | 641-464-3414 | Phase 5 |
| 692 | Hometown | Superior | 1150 East 3Rd | Superior | NE | 68978 | 402-879-4840 | Phase 5 |
| 697 | Hometown | Seneca | 1710 North Street | Seneca | KS | 66538 | 785-336-3855 | Phase 5 |
| 698 | Hometown | Gothenburg | 718 4Th Street | Gothenburg | NE | 69138 | 308-537-8780 | Phase 5 |
| 699 | Hometown | Scott City | 1702 Main Street | Scott City | KS | 67871 | 620-872-5578 | Phase 4 |
| 706 | Hometown | Doniphan | 115 Leroux Drive | Doniphan | MO | 63935 | 573-996-3703 | Phase 5 |
| 708 | Hometown | Carrollton | 812 Harvest Hills Drive | Carrollton | MO | 64633 | 660-542-1228 | Phase 3 |
| 709 | Hometown | Eldorado Springs | 1307 S State Hwy 32 | Eldorado Springs | MO | 64744 | 417-876-2943 | Phase 4 |
| 710 | Hometown | Gallatin | 212 North Main Street | Gallatin | MO | 64640 | 660-663-3313 | Phase 5 |
| 716 | Hometown | Mount Carmel | 1520 W. 9Th Street | Mount Carmel | IL | 62863 | 618-262-2475 | Phase 3 |
| 717 | Hometown | Minerva | 825 Valley Street | Minerva | OH | 44657 | 330-868-9958 | Phase 3 |
| 719 | Hometown | Woodsfield | 378 Lewisville Road | Woodsfield | OH | 43793 | 740-472-0851 | Phase 5 |
| 720 | Hometown | Batesville | 100 Cross Country Plaza | Batesville | IN | 47006 | 812-933-0240 | Phase 3 |
| 732 | Hometown | Glencoe | 3225 10Th Street East | Glencoe | MN | 55336 | 320-864-6005 | Phase 5 |
| 737 | Hometown | Grafton | 932 W. 12Th Street | Grafton | WI | 58237 | 701-352-2461 | Phase 3 |
| 742 | Hometown | East Grand Forks | 421 Gateway Drive Ne | East Grand Forks | MN | 56721 | 218-773-1130 | Phase 5 |
| 743 | Hometown | Beulah | 1900 Hwy 49 | Beulah | ND | 58523 | 701-873-5990 | Phase 3 |
| 749 | Hometown | St James | 301 1St Avenue South | St James | MN | 56081 | 507-375-3188 | Phase 5 |
| 751 | Hometown | Sisseton | 1712 Sd Hwy 10 | Sisseton | SD | 57262 | 605-742-0055 | Phase 5 |

**Exhibit A**

**Store List**

| Store No. | Banner | Store | Address | City | State | Zip Code | Telephone No. | Phase |
|---|---|---|---|---|---|---|---|---|
| 760 | Hometown | Green River | 1105 Bridger Drive | Green River | WY | 82935 | 307-875-5244 | Phase 5 |
| 762 | Hometown | Thermopolis | 142 S Hwy 20 | Thermopolis | WY | 82443 | 307-864-3777 | Phase 3 |
| 763 | Hometown | Custer | 1135 Mt. Rushmore Road | Custer | SD | 57730 | 605-673-3883 | Phase 3 |
| 765 | Hometown | Mountain View | 1080 Hwy 414 | Mountain View | WY | 82939 | 307-782-7919 | Phase 5 |
| 788 | Hometown | Columbus | 200 Commerce Drive | Columbus | WI | 53925 | 920-623-9183 | Phase 5 |
| 789 | Hometown | Waupaca | 825 West Fulton Street | Waupaca | WI | 54981 | 715-258-9000 | Phase 5 |
| 793 | Hometown | Mayville | 2050 Horicon Street | Mayville | WI | 58257 | 920-387-0257 | Phase 5 |
| 798 | Hometown | Roosevelt | 1635 E. Highway 40 | Roosevelt | UT | 84066 | 435-722-3888 | Phase 5 |
| 799 | Hometown | Tremonton | 440 W. Main Street | Tremonton | UT | 84337 | 435-257-8900 | Phase 5 |

Phase 3    Sale Term 1/11/19-4/7/19
Phase 4    Projected Sale Term 1/18/19-4/14/19
Phase 5    Projected Sale Term 2/1/19-4/28/19

**Exhibit B**

### Shopko
### Budget of Consultant Controlled Expenses

| | |
|---|---|
| # of Stores | 127 |
| # of Days | 87 |
| # Store Weeks | 1,578.4 |
| # of Weeks | 12.4 |

| | | |
|---|---|---|
| In store signage | $ | 732,000 |
| Signwalkers/Media/Production | $ | 1,677,650 |
| **Subtotal Advertising** | **$** | **2,409,650** |
| | | |
| Supervision | $ | 3,390,784 |
| Miscellaneous | $ | 155,000 |
| | | |
| **Total Consultant Controlled Expenses** | **$** | **5,955,434** |

This expense budget is based upon the above Sale Term. Any changes to the Sale Term may result in adjustments to the expense budget, which will be agreed upon by Merchant and GBRP.

## **Exhibit B**

**Sale Guidelines**

## Sale Guidelines[1]

1.    The Sales shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

2.    The Sales shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sales shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

3.    On "shopping center" property, Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; *provided* that Consultant may solicit customers in the Stores themselves.  On "shopping center" property, Consultant shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.    At the conclusion of the Sales, Consultant shall vacate the Stores in broom clean condition; *provided* that Consultant may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) ("FF&E") not sold in the Sales at the conclusion of the Sales, without cost or liability of any kind to Consultant. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date or Vacate Date, as applicable, Consultant may abandon, in place and without further responsibility or liability of any kind, any FF&E.

5.    Consultant may advertise the Sales as a "store closing", "sale on everything", "everything must go", "everything on sale" or similar-themed sale.  All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Merchant in accordance the Consulting Agreement.

6.    Consultant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sales; *provided* that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Merchant and Consultant shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sales are

---

[1]    Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Motion.

being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and Consultant shall be permitted to utilize sign walkers and A-frames in a safe and professional manner and in accordance with the terms of the Approval Order (as defined in the Consulting Agreement).  Nothing contained in these Sale Guidelines shall be construed to create or impose upon Consultant any additional restrictions not contained in the applicable lease agreement.

7.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

8.      Except with respect to the hanging of exterior banners, Consultant shall not make any alterations to the storefront or exterior walls of any Stores.

9.      Consultant shall not make any alterations to interior or exterior Store lighting.  No property of the landlord of a Store shall be removed or sold during the Sales.  The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

10.     Consultant shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

11.     Subject to the provisions of the Agreement, Consultant shall have the right to sell all Owned FF&E, approved by the Merchant.  Consultant may advertise the sale of the Owned FF&E in a manner consistent with these guidelines.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through the front door of a Store during business hours provided such item may be carried out by one person in a shopping bag or cart, other areas after applicable business hours.  For the avoidance of doubt, as of the Sale Termination Date or the Vacate Date, as applicable, Consultant may abandon, in place and without further responsibility, any FF&E.

12.     The Consultant shall be entitled to include Additional Consultant Goods in the Sale in accordance with the terms of the Approval Order and the Consulting Agreement.

13.     At the conclusion of the Sales at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases.  The Merchant, Consultant and their agents and representatives shall continue to have access to the Stores as provided for in the Agreement.

14.     Post-petition Rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Consultant shall have no responsibility to the landlords therefor.

15.     The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Store affected hereby contends that Consultant or Merchant is in breach of or default under these Sale Guidelines, such landlord shall

2

email or deliver written notice by overnight delivery on the Merchant and Consultant as follows:

If to Consultant:

Gordon Brothers Retail Partners, LLC
800 Boylston Street, 27th Floor
Boston, MA 02199
Attention: Mackenzie L. Shea
Email address: mshea@gordonbrothers.com

If to Merchant:

Specialty Retail Shops Holding Corp.
700 Pilgrim Way
Green Bay, Wisconsin, 54304
Attention:  Legal Department
Email address: sbuckna@shopko.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Steven N. Serajeddini, Esq.
Email address:  steven.serajeddini@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Travis Bayer, Esq.
E-mail address:  travis.bayer@kirkland.com

3

## **Exhibit C**

**Store Closings**

Shopko GOB
Pre Petition Closures

| Count | Store # | Sqft. | Open Date | Address 1 | Address 2 | City | State | Zip | Lease Termination | Expected Store Close Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) | 129 | 99,279 | 07-Mar-95 | 4515 SOUTH REGAL STREET | | SPOKANE | WA | 99223 | 11/30/2034 | 3/3/2019 |
| 2) | 172 | 109,963 | 04-Apr-00 | 3400 NORTH 27TH STREET | | LINCOLN | NE | 68521 | 1/30/2021 | 3/3/2019 |
| 3) | 205 | 22,734 | 05-Oct-16 | 94 NORTH 400 EAST | | DELTA | UT | 84624 | 11/30/2031 | 3/3/2019 |
| 4) | 538 | 21,953 | 21-Jun-15 | 710 N L AND G AVENUE | | ANTHONY | KS | 67003 | 2/28/2030 | 3/3/2019 |
| 5) | 548 | 25,614 | 27-Mar-15 | 416 U.S. HIGHWAY 59 | | MAHNOMEN | MN | 56557 | 2/28/2023 | 3/3/2019 |
| 6) | 552 | 25,614 | 27-Mar-15 | 1420 NORTH 7TH STREET | | OAKES | ND | 58474 | 10/31/2022 | 3/3/2019 |
| 7) | 557 | 25,869 | 20-Sep-15 | 1174 N. MAIN STREET | | NEPHI | UT | 84648 | 9/30/2030 | 3/3/2019 |
| 8) | 558 | 21,450 | 21-Jun-15 | 614 W 3RD STREET | | REDFIELD | SD | 57469 | 3/31/2020 | 3/3/2019 |
| 9) | 563 | 25,860 | 04-Oct-15 | 406 GATEWAY AVENUE | | MAUSTON | WI | 53948 | 10/31/2030 | 3/3/2019 |
| 10) | 564 | 25,860 | 29-Oct-15 | 200 RED BULL DIVISION DRIVE | | WEBSTER CITY | IA | 50595 | 10/31/2030 | 3/3/2019 |
| 11) | 565 | 25,860 | 29-Oct-15 | 1620 N. 2ND STREET | | CHEROKEE | IA | 51012 | 10/31/2030 | 3/3/2019 |
| 12) | 567 | 22,317 | 21-Jun-15 | 810 DIEKMANN DRIVE | | PAYNESVILLE | MN | 56362 | 6/30/2025 | 3/3/2019 |
| 13) | 570 | 22,000 | 21-Jun-15 | 905 W SD HIGHWAY 46 | | WAGNER | SD | 57380 | 4/30/2025 | 3/3/2019 |
| 14) | 571 | 22,000 | 21-Jun-15 | 620 E HIGHWAY 12 | | WEBSTER | SD | 57274 | 3/31/2020 | 3/3/2019 |
| 15) | 572 | 25,614 | 21-Jun-15 | 401 US HIGHWAY 24 | | LEADVILLE | CO | 80461 | 3/31/2025 | 3/3/2019 |
| 16) | 573 | 21,000 | 21-Jun-15 | 87 S FOSSIL ST | | RUSSELL | KS | 67665 | 3/31/2025 | 3/3/2019 |
| 17) | 575 | 40,000 | 21-Jun-15 | 908 WEST AVENUE D | | LOVINGTON | NM | 88260 | 3/31/2022 | 3/3/2019 |
| 18) | 578 | 23,029 | 04-Oct-15 | 415 US HIGHWAY 24 N | PO BOX 5275 | BUENA VISTA | CO | 81211 | 7/31/2025 | 3/3/2019 |
| 19) | 581 | 22,000 | 04-Oct-15 | 1709 MAIN STREET | | LISBON | ND | 58054 | 8/31/2025 | 3/3/2019 |
| 20) | 582 | 20,303 | 31-Jan-16 | 1000 US BUSINESS 67 | | PRESIDIO | TX | 79845 | 1/31/2026 | 3/3/2019 |
| 21) | 583 | 20,337 | 31-Jan-16 | 860 S MAIN STREET | | BLANDING | UT | 84511 | 1/31/2026 | 3/3/2019 |
| 22) | 585 | 20,633 | 13-Mar-16 | 935 3RD STREET SE | | MAYVILLE | ND | 58257 | 1/31/2026 | 3/3/2019 |
| 23) | 586 | 20,900 | 13-Mar-16 | 1401 STATE STREET | | PHILLIPSBURG | KS | 67661 | 1/31/2026 | 3/3/2019 |
| 24) | 588 | 29,985 | 13-Mar-16 | 660 N MAIN ST | | BEAVER | UT | 84713 | 2/28/2031 | 3/3/2019 |
| 25) | 596 | 22,773 | 08-Jun-16 | 1208 N HIGHWAY 77 | | DELL RAPIDS | SD | 57022 | 7/31/2031 | 3/3/2019 |
| 26) | 597 | 22,773 | 08-Jun-16 | 133 TROTTER AVENUE | | ORD | NE | 68862 | 7/31/2031 | 3/3/2019 |
| 27) | 641 | 27,398 | 06-Aug-12 | 110 WATTERS DRIVE | | DWIGHT | IL | 60420 | 5/31/2022 | 3/3/2019 |
| 28) | 685 | 24,600 | 30-Dec-12 | 1425 EDGINGTON AVENUE | | ELDORA | IA | 50627 | 9/19/2022 | 3/3/2019 |
| 29) | 693 | 42,456 | 19-Nov-12 | 821 WEST CRAWFORD STREET | | CLAY CENTER | KS | 67432 | 6/30/2023 | 3/3/2019 |
| 30) | 700 | 26,000 | 30-Dec-12 | 1217 SOUTH HIGHWAY 71 | | KIMBALL | NE | 69145 | 7/31/2023 | 3/3/2019 |
| 31) | 701 | 32,880 | 19-Nov-12 | 1212 W. MAIN STREET | | LYONS | KS | 67554 | 8/31/2023 | 3/3/2019 |
| 32) | 702 | 27,659 | 19-Nov-12 | 908 E. 14TH STREET | P.O. BOX 450 | LARNED | KS | 67550 | 8/31/2023 | 3/3/2019 |
| 33) | 707 | 16,925 | 30-Dec-12 | 101 S. POLK | | ALBANY | MO | 64402 | 5/31/2021 | 3/3/2019 |
| 34) | 771 | 12,659 | 10-Sep-12 | 117 WEST 1ST AVENUE | | PLENTYWOOD | MT | 59254 | OWNED | 3/3/2019 |
| 35) | 776 | 21,207 | 15-Oct-12 | 925 NORTH 6TH STREET | | GREYBULL | WY | 82426 | 1/31/2024 | 3/3/2019 |
| 36) | 65 | 90,539 | 14-Jul-86 | 8105 W FAIRVIEW AVENUE | | BOISE | ID | 83704 | 1/31/2027 | 3/17/2019 |
| 37) | 83 | 94,092 | 12-Sep-88 | 2165 EAST 9400 SOUTH | | SANDY CITY | UT | 84093 | 1/31/2027 | 3/17/2019 |
| 38) | 85 | 94,136 | 12-Sep-88 | 5800 SOUTH REDWOOD ROAD | | SALT LAKE CITY | UT | 84123 | 2/23/2024 | 3/17/2019 |
| 39) | 105 | 100,734 | 03-Oct-90 | 125 S STATE STREET | | OREM | UT | 84058 | 1/31/2027 | 3/17/2019 |
| 40) | 113 | 98,034 | 15-Oct-93 | 5500 MARTIN WAY E | | LACEY | WA | 98516 | 1/31/2027 | 3/17/2019 |
| 41) | 646 | 37,899 | 10-Sep-12 | 3825 S. HURON ROAD | | STANDISH | MI | 48658 | 4/30/2022 | 3/17/2019 |
| 42) | 20 | 60,776 | 20-Oct-72 | 2400 ROSE STREET | | LA CROSSE | WI | 54603 | 10/18/2019 | 4/8/2019 |
| 43) | 33 | 81,171 | 16-Nov-81 | 1578 APPLETON RD | | MENASHA | WI | 54952 | 6/30/2021 | 4/8/2019 |
| 44) | 81 | 94,237 | 24-Oct-88 | 5801 SUMMIT VIEW AVE | | YAKIMA | WA | 98908 | 11/30/2029 | 4/8/2019 |
| 45) | 82 | 94,013 | 12-Sep-88 | 5959 SOUTH STATE STREET | | MURRAY | UT | 84107 | 2/27/2038 | 4/8/2019 |
| 46) | 90 | 83,363 | 12-Jul-89 | 1771 WISCONSIN AVE | | GRAFTON | WI | 53024 | 12/31/2031 | 4/8/2019 |
| 47) | 95 | 100,843 | 24-Sep-89 | 2655 SOUTH BROADWAY AVE | | BOISE | ID | 83706 | 11/30/2029 | 4/8/2019 |
| 48) | 178 | 81,740 | 08-Oct-08 | N 66 W 25201 COUNTY VV | | SUSSEX | WI | 53089 | 1/27/2029 | 4/8/2019 |

Shopko GOB
Pre Petition Closures

| Count | Store # | Sqft. | Open Date | Address 1 | Address 2 | City | State | Zip | Lease Termination | Expected Store Close Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 49) | 203 | 22,734 | 30-Aug-16 | 124 LUMAR DR | | JACKSBORO | TX | 76458 | 10/31/2031 | 1/19/2019 |
| 50) | 211 | 25,154 | 26-Jul-16 | 2402 CENTRAL AVE. | | ESTHERVILLE | IA | 51334 | 8/31/2021 | 4/8/2019 |
| 51) | 504 | 9,412 | 07-Jul-08 | W3208 VAN ROY ROAD | | APPLETON | WI | 54915 | 2/3/2029 | 2/15/2019 |
| 52) | 543 | 25,614 | 27-Mar-15 | 600 US HIGHWAY 2E | | WOLF POINT | MT | 59201 | 12/31/2031 | 4/8/2019 |
| 53) | 600 | 20,694 | 13-Mar-16 | 911 S K AVE | | VINTON | IA | 52349 | 10/31/2030 | 4/8/2019 |
| 54) | 607 | 35,000 | 03-Dec-10 | 1010 SOUTH MAINLINE DR | | SEYMOUR | WI | 54165 | 9/30/2026 | 4/8/2019 |
| 55) | 622 | 34,502 | 06-Aug-12 | E 9916 M28 EAST | P.O. BOX 110 | WETMORE | MI | 49895 | 10/18/2019 | 4/8/2019 |
| 56) | 639 | 34,923 | 06-Aug-12 | 840 NORTH U.S. 41 | P.O. BOX 20 | ROCKVILLE | IN | 47872 | 5/31/2021 | 4/8/2019 |
| 57) | 650 | 35,551 | 15-Oct-12 | 56419 POKAGON STREET | | DOWAGIAC | MI | 49047 | 5/31/2021 | 4/8/2019 |
| 58) | 662 | 46,556 | 06-Aug-12 | 211 S. 23RD STREET | | PLATTSMOUTH | NE | 68048 | 12/31/2028 | 4/8/2019 |
| 59) | 703 | 26,400 | 19-Nov-12 | 300 CROSS STREET | | BURLINGTON | KS | 66839 | 5/31/2021 | 4/8/2019 |
| 60) | 708 | 27,000 | 02-Jul-12 | 812 HARVEST HILLS DRIVE | | CARROLLTON | MO | 64633 | 5/31/2021 | 4/8/2019 |
| 61) | 716 | 58,150 | 30-Dec-12 | 1520 W. 9TH STREET | | MT. CARMEL | IL | 62863 | 5/31/2021 | 4/8/2019 |
| 62) | 717 | 35,551 | 30-Dec-12 | 825 VALLEY STREET | ROUTE 183 | MINERVA | OH | 44657 | 5/31/2021 | 4/8/2019 |
| 63) | 719 | 36,047 | 30-Dec-12 | 378 LEWISVILLE ROAD | P.O. BOX 651 | WOODSFIELD | OH | 43793 | 5/31/2021 | 4/8/2019 |
| 64) | 720 | 43,200 | 02-Jul-12 | 100 CROSS COUNTRY PLAZA | | BATESVILLE | IN | 47006 | 6/5/2022 | 4/8/2019 |
| 65) | 743 | 41,354 | 15-Oct-12 | 1900 HWY 49 | P.O. BOX 1239 | BEULAH | ND | 58523 | 4/30/2021 | 4/8/2019 |
| 66) | 762 | 31,583 | 19-Nov-12 | 142 S HWY 20 | PO BOX 1351 | THERMOPOLIS | WY | 82443 | 7/31/2029 | 4/8/2019 |
| 67) | 763 | 27,300 | 19-Nov-12 | 1135 MT. RUSHMORE ROAD | | CUSTER | SD | 57730 | 12/31/2023 | 4/8/2019 |

DRAFT – PRIVILEGED AND CONFIDENTIAL
SUBJECT TO MATERIAL CHANGE

Shopko GOB
Post Petition Closures

| Count | Store # | Sqft. | Open Date | Address 1 | Address 2 | City | State | Zip | Lease Termination | Expected Store Close Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) | 1 | 82,815 | 04-Apr-62 | 216 S. MILITARY AVE. | | GREEN BAY | WI | 54303 | 2/25/2023 | 4/15/2019 |
| 2) | 3 | 87,954 | 07-Nov-77 | 3415 CALUMET AVE. | | MANITOWOC | WI | 54220 | 12/31/2035 | 4/15/2019 |
| 3) | 18 | 94,130 | 22-Mar-72 | 1710 S. MAIN ST. | | WEST BEND | WI | 53095 | 11/30/2029 | 4/15/2019 |
| 4) | 29 | 99,101 | 15-Sep-80 | 7401 MINERAL POINT RD. | | MADISON | WI | 53717 | 12/31/2038 | 4/15/2019 |
| 5) | 35 | 90,499 | 13-Sep-82 | 2820 HWY 63 SOUTH | | ROCHESTER | MN | 55904 | 5/31/2026 | 4/15/2019 |
| 6) | 39 | 86,739 | 18-Jul-83 | 4200 SOUTH 27TH STREET | BISHOP HEIGHTS SHOPPING CENTER | LINCOLN | NE | 68502 | 11/30/2029 | 4/15/2019 |
| 7) | 45 | 67,256 | 15-Oct-84 | 601 GALVIN ROAD SOUTH | | BELLEVUE | NE | 68005 | 5/31/2026 | 4/15/2019 |
| 8) | 47 | 83,369 | 15-Oct-84 | 100 SOUTH 66TH STREET | | LINCOLN | NE | 68510 | 2/29/2020 | 4/15/2019 |
| 9) | 55 | 90,334 | 05-Aug-85 | 1200 MAIN STREET | | STEVENS POINT | WI | 54481 | 12/31/2031 | 4/15/2019 |
| 10) | 59 | 66,781 | 30-Sep-85 | 1001 HIGHWAY 15 SOUTH | | FAIRMONT | MN | 56031 | 12/31/2035 | 4/15/2019 |
| 11) | 64 | 90,526 | 14-Jul-86 | 2100 CALDWELL BLVD. | | NAMPA | ID | 83651 | 11/30/2029 | 4/15/2019 |
| 12) | 76 | 90,585 | 19-Oct-87 | 1601 W. 41ST ST | | SIOUX FALLS | SD | 57105 | 12/31/2035 | 4/15/2019 |
| 13) | 80 | 94,120 | 18-May-88 | 2201 ZEIER RD. | | MADISON | WI | 53704 | 11/30/2029 | 4/15/2019 |
| 14) | 84 | 94,230 | 12-Sep-88 | 1553 WEST 9000 S | | WEST JORDAN | UT | 84088 | 5/31/2026 | 4/15/2019 |
| 15) | 87 | 94,230 | 12-Sep-88 | 1018 WASHINGTON BOULEVARD | | OGDEN | UT | 84404 | 5/31/2026 | 4/15/2019 |
| 16) | 93 | 100,840 | 27-Sep-89 | 60 NE BEND RIVER MALL AVE | | BEND | OR | 97703 | 1/31/2027 | 4/15/2019 |
| 17) | 97 | 94,336 | 23-Sep-89 | 4850 WEST 3500 SOUTH | | WEST VALLEY CITY | UT | 84120 | 12/31/2031 | 4/15/2019 |
| 18) | 100 | 94,225 | 05-Jul-90 | 699 S GREEN BAY ROAD | | NEENAH | WI | 54956 | 12/31/2031 | 4/15/2019 |
| 19) | 101 | 94,230 | 05-Jul-90 | 4501 EAST ARROWHEAD PARKWAY | | SIOUX FALLS | SD | 57110 | 8/3/2019 | 4/15/2019 |
| 20) | 104 | 71,340 | 05-Jul-90 | 747 SOUTH MAIN | | BRIGHAM CITY | UT | 84302 | 5/31/2026 | 4/15/2019 |
| 21) | 108 | 71,345 | 06-Mar-91 | 955 NORTH MAIN STREET | | SPANISH FORK | UT | 84660 | 11/30/2029 | 4/15/2019 |
| 22) | 134 | 77,559 | 09-Jul-96 | 1450 SOUTH GRAND AVE. | | PULLMAN | WA | 99163 | 5/31/2026 | 4/15/2019 |
| 23) | 141 | 80,327 | 24-Jul-98 | 313 NORTH ROOSEVELT AVE | | BURLINGTON | IA | 52601 | 11/30/2029 | 4/15/2019 |
| 24) | 142 | 65,709 | 24-Jul-98 | 4810 AVENUE O | | FORT MADISON | IA | 52627 | OWNED | 4/15/2019 |
| 25) | 171 | 90,804 | 04-Apr-00 | 1800 PLOVER ROAD | | PLOVER | WI | 54467 | 1/31/2025 | 4/15/2019 |
| 26) | 175 | 111,142 | 03-Oct-00 | 6845 SOUTH 27TH STREET | | LINCOLN | NE | 68512 | 1/30/2021 | 4/15/2019 |
| 27) | 505 | 9,315 | 07-Jul-08 | 2101 EAST EVERGREEN DRIVE | | APPLETON | WI | 54913 | 2/3/2029 | 2/28/2019 |
| 28) | 534 | 28,600 | 27-Mar-15 | 602 MAIN AVENUE WEST | | ROLLA | ND | 58367 | 3/31/2021 | 4/15/2019 |
| 29) | 546 | 24,800 | 27-Mar-15 | 333 S. LINCOLN | | BURLINGTON | CO | 80807 | 3/31/2021 | 4/15/2019 |
| 30) | 566 | 22,347 | 21-Jun-15 | 216 MAIN AVENUE NE | | WARROAD | MN | 56763 | 6/30/2025 | 4/15/2019 |
| 31) | 574 | 20,250 | 21-Jun-15 | 2052 E COMMERCIAL AVE | | LOWELL | IN | 46356 | 12/31/2025 | 4/15/2019 |
| 32) | 587 | 28,373 | 13-Mar-16 | 1180 S 16TH ST | | CLARINDA | IA | 51632 | 1/31/2026 | 4/15/2019 |
| 33) | 637 | 34,994 | 06-Aug-12 | 1215 E. MAIN STREET | P.O. BOX 4 | ATTICA | IN | 47918 | 5/31/2021 | 4/15/2019 |
| 34) | 665 | 24,320 | 19-Nov-12 | 808 4TH ST. SOUTHEAST | PO BOX 210 | HAMPTON | IA | 50441 | 1/31/2023 | 4/15/2019 |
| 35) | 676 | 30,000 | 30-Dec-12 | 1901 COURT AVENUE | | CHARITON | IA | 50049 | 11/30/2022 | 4/15/2019 |
| 36) | 677 | 42,456 | 19-Nov-12 | 2220 HWY 175 WEST | PO BOX 149 | ONAWA | IA | 51040 | 2/6/2023 | 4/15/2019 |
| 37) | 684 | 24,900 | 30-Dec-12 | 106 SMITH STREET | | BLOOMFIELD | IA | 52537 | 10/31/2021 | 4/15/2019 |
| 38) | 699 | 32,600 | 19-Nov-12 | 1702 MAIN STREET | | SCOTT CITY | KS | 67871 | OWNED | 4/15/2019 |
| 39) | 711 | 27,565 | 02-Jul-12 | 459 GRAND AVE | PO BOX 139B | MEMPHIS | MO | 63555 | 7/31/2029 | 4/15/2019 |