# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064-TLS |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) ESTABLISHING THE BIDDING PROCEDURES FOR
### PLAN SPONSORS AND (II) GRANTING RELATED RELIEF[2]

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby move this Court for an order (I) establishing bidding procedures for plan sponsors, and (II) granting related relief.  In further support of this Motion, the Debtors respectfully state as follows.

### Introduction

1.    The Debtors have diligently worked with their financial advisors since 2017 to develop and explore strategic alternatives to maximize value for the Debtors and their assets.  These Bidding Procedures represent the final stage of a thorough and effective marketing process conducted by the Debtors and their advisors over the course of nearly 18 months.  In

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    The Debtors also filed the *Debtors' Motion for Entry of Orders (I) Establishing Bidding Procedures for the Pharmacy Assets, (II) Approving the Transactions, and (III) Granting Related Relief* (the "Pharmacy Bidding Procedures Motion") concurrently herewith.  The Pharmacy Bidding Procedures Motion seeks to establish bidding procedures for the Debtors' pharmacy-related assets, whereas this motion seeks to establish bidding procedures with respect to a plan sponsor.  As such, the relief sought in each motion does not overlap.

May 2017, the Debtors engaged Houlihan Lokey, Inc. ("Houlihan Lokey") to act as their financial advisor and to explore alternatives.  The Debtors and their advisors engaged in a significant marketing process to solicit bids for an equity investment or the purchase of the Debtors' assets in order to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders.  Despite significant interest, this process failed ultimately to yield a mutually acceptable transaction.

2.      In August 2018, the Debtors and their advisors commenced another process to market the Debtors assuming an exit from the pharmacy business (which was separately marketed and yielded numerous successful transactions).  While this process yielded some interest, it became clear that the Debtors would be more attractive if marketed as part of a comprehensive restructuring.

3.      The Debtors contacted a select group of potential bidders, and intend to combine to build off this process in connection with the chapter cases.  To that end, the Debtors propose these Bidding Procedures for the process to obtain a plan sponsor's equity investment.

4.       These proposed Bidding Procedures provide the Debtors with a cost-effective mechanism to realize value for, as contemplated by the Debtors' chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan"), either (a) the sale of the Debtors' assets or (b) a reorganization through the issuance, and purchase by a plan sponsor, of new common equity interests in the reorganized Debtors (the "New Shopko Interests") and the continued business of the Debtors (a "Transaction").

5.      Moreover, pursuant to the debtor-in-possession financing facility (the "DIP Facility"), the agreements governing such DIP Facility (the "DIP Credit Agreement"), and the proposed order approving such DIP Facility (such interim and final orders, when entered, the "Interim DIP Order," the "Final Order," and collectively, the "DIP Orders"), the Debtors must

2

satisfy certain milestones with respect to the Transaction, including delivering a commitment letter from a plan sponsor, among other milestones.  Access to the DIP Facility is critical to the Debtors' ability to operate throughout these chapter 11 cases.  Failure to adhere to the milestones would have severe consequences and threaten the Debtors ability to continue along the best path for the Debtors and maximize the value of their estates.  Thus, to maximize the value to be received in the sale of these Assets, the proposed Bidding Procedures should be approved.

## Relief Requested

6.      The Debtors seek entry of an order (the "Bidding Procedures Order"):   (a) authorizing and approving the bidding procedures attached hereto as **Exhibit A** (the "Bidding Procedures");[3] (b) establishing certain dates and deadlines including, the Bid Deadline, and the date of Auction, if any; (c) approving the manner of notice of the Auction, if any; and (d) granting related relief.

## Jurisdiction and Venue

7.      The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[3]    Capitalized terms used by not defined herein have the meanings given to them in the Bidding Procedures.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105, 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9014, and Rule 6004-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules").

### Background

10.     The Debtors are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as company operated pharmacy and optical services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and operate approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.

11.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

12.     A description of the Debtors' businesses is more fully set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

4

## The Bidding Procedures

13.     As described in greater detail in the First Day Declaration, a confluence of factors contributed to the Debtors' need to commence these chapter 11 cases, including the general downturn in the retail industry and the marked shift away from brick-and-mortar retail to online channels.  The combination of these factors has made it increasingly difficult for Debtors to maintain their cost and capital structure as sales have remained depressed, impairing the Debtors' liquidity.

14.     As described above, the Debtors and their advisors are engaged in a marketing process for plan sponsors in order to facilitate the Debtors' emergence from these chapter 11 cases. The Debtors' proposed plan of reorganization, filed contemporaneously herewith (the "Plan"), includes a toggle feature, resulting in either:  (a) an equitization restructuring, which is a reorganization resulting in either exit facility financing or a debt for equity conversion for the Debtors' lenders under that certain Third Amended and Restated Loan and Security Agreement (the "Credit Agreement"); or (b) an asset sale restructuring, which allows the Debtors to enter into sales transactions for the sale or disposition the Debtors' assets.  Moreover, the equitization restructuring provides for the implementation of the terms of an acceptable plan sponsor investment.  The Plan toggle provides the Debtors with the latitude necessary to negotiate the precise terms of their ultimate emergence from chapter 11 and the terms of the Plan may be revised as necessary.  Consistent with this process, the Debtors have begun marketing their assets and file this Motion seeking approval of Bidding Procedures to continue these efforts already commenced prepetition.

15.     The Bidding Procedures and Plan provide for substantial flexibility with respect to the structure of any transaction—*e.g.*, the sale of the Debtors' assets or a reorganization through

the issuance, and purchase by a plan sponsor, of the New Shopko Interests and the continued business of the Debtors—and the terms of the Plan may be revised to the extent necessary.

16.     Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' businesses.  The Bidding Procedures are designed to—and the Debtors believe the Bidding Procedures will actually operate to—maximize the likelihood of an acceptable overbid for the benefit of enterprise-wide stakeholders.  To maximize the competitiveness of any bidding process, pursuant to this Motion, the Debtors also seek authority, but not direction, to pay or incur the obligation to pay, as the Debtors deem fit in an exercise of their business judgment:  (a) certain Expense Reimbursement and Work Fees in an aggregate amount not to exceed $1,000,000; and (b) a Breakup Fee in an amount not to exceed three percent of any proposed Purchase Price in connection with a third-party stalking horse bid.

17.     In consultation with their investment banker, Houlihan Lokey, the Debtors have developed a list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a Transaction.  The list of parties includes both strategic investors and financial investors (collectively, the "Contact Parties").  The Debtors and Houlihan Lokey will contact (to the extent not already contacted) the Contact Parties to explore their interest in pursuing a Transaction.  The Contact Parties may include parties whom the Debtors or their advisors previously contacted regarding a transaction, regardless of whether such parties expressed any interest at such time in pursuing a transaction.  The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

<u>**The Bidding Procedures Order**</u>

**I.    The Bidding Procedures.**

18.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached hereto as <u>**Exhibit A**</u>, to govern the Auction process.  The Debtors designed the Bidding Procedures to encourage all entities to put their best bids forward and to maximize the value of the Debtors' estates.  The following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[4]

(a)    <u>**Participation Requirements**</u>.

(i)    To receive due diligence information, including full access to the Debtors' electronic data room and additional non-public information regarding the Debtors, a party interested in consummating a Transaction (a "<u>Potential Bidder</u>") should deliver (or have delivered) to each of: (i) Houlihan Lokey, 225 South 6th Street, Minneapolis, Minnesota 55402, Attn: Stephen Spencer (SSpencer@HL.com), and Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, New York 10167, Attn: Sanaz Memarsadeghi (SMemarsadeghi@HL.com) and Hussein El Husseini (HElhusseini@HL.com); and (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven Serajeddini (steven.serajeddini@kirkland.com) and Daniel Rudewicz (daniel.rudewicz@kirkland.com), and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Travis Bayer (travis.bayer@kirkland.com) (the "<u>Debtors' Advisors</u>"), the following documents (collectively, the "<u>Preliminary Bid Documents</u>"):

(A)    an executed Confidentiality Agreement, to the extent not already executed; and

---

[4]    This summary is qualified in its entirety by the Bidding Procedures attached as <u>**Exhibit A**</u>.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

(B)     proof or other documentation acceptable to the Debtors of the Potential Bidder's financial capacity to close a proposed Transaction.  Bidding Procedures ¶ B.

(ii)    Promptly after a Potential Bidder delivers Preliminary Bid Documents, the Debtors will determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may proceed to conduct due diligence and ultimately submit a Bid (as defined below) and participate in the Auction, as applicable, and will provide copies of any such notices to the Notice Parties and to counsel to the official committee of unsecured creditors (the "Committee") appointed in these cases.  Except as otherwise determined in the Debtors' business judgment, only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "Acceptable Bidder") may submit Bids.  Bidding Procedures ¶ B.

(iii)   Houlihan Lokey will provide access, in the electronic data room, to a form equity commitment letter ("Form Equity Commitment Letter") and form chapter 11 plan ("Form Plan").  Bidding Procedures ¶ B.

(iv)    For any Acceptable Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold, or to delay providing, any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Acceptable Bidder at such time. Bidding Procedures ¶ B.

(v)     Each Acceptable Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Acceptable Bidder and its contemplated transaction.    Bidding Procedures ¶ B.

(b)     **Bid Deadline**. An Acceptable Bidder that desires to make a proposal, solicitation, or offer (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in .pdf or similar format) so as to be **actually received** on or before **February 21, 2019, at 4:00 p.m. (prevailing Central Time)** (the "Bid Deadline") to:

(i)     Houlihan Lokey, 225 South 6th Street, Minneapolis, Minnesota 55402, Attn: Stephen Spencer (SSpencer@HL.com), and Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, New York 10167, Attn: Sanaz Memarsadeghi (SMemarsadeghi@HL.com) and Hussein El Husseini (HElhusseini@HL.com); and

(ii)    Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven Serajeddini (steven.serajeddini@kirkland.com) and Daniel Rudewicz (daniel.rudewicz@kirkland.com), and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Travis Bayer (travis.bayer@kirkland.com). Bidding Procedures ⁋ C.

(c)    **Bid Requirements (Local Bankr. R. 6004-1(C))**.  Each Bid by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements"):

(i)    Purpose.  Each Acceptable Bidder must state what the Bid is an offer by the Acceptable Bidder to purchase, including the percentage of the New Shopko Interests.  Bidding Procedures ⁋ D(i).

(ii)    Purchase Price.  Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, including, for example, certain liabilities to be assumed by the Acceptable Bidder as part of the Plan (the "Purchase Price").  Bidding Procedures ⁋ D(ii).

(iii)    Deposit.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid to be held in one or more escrow accounts on terms acceptable to the Debtors (the "Deposit").  Bidding Procedures ⁋ D(iii).

(iv)    Marked Agreement.  Each Bid must include a marked version of the Form Equity Commitment Letter (or other applicable agreement providing the terms of the Transaction) and Form Plan, in each case, together with the exhibits and schedules related thereto and any related Transaction documents or other material documents integral to such Bid, pursuant to which the Acceptable Bidder proposes to effectuate the Transaction (collectively, the "Transaction Documents").  Any modifications to the Transaction contemplated by the Form Equity Commitment Letter (or other applicable agreement providing the terms of the Transaction) and Form Plan must be in form and substance acceptable to the Debtors.  Bidding Procedures ⁋ D(iv).

(v)    Committed Financing.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to

satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, or shall have covenants and conditions acceptable to the Debtors. For the avoidance of doubt, funding commitments for any Acceptable Bidder's Purchase Price may be provided by one or more of the Credit Agreement Primary Agent (as defined in the Plan), the Term Loan B-1 Agent (as defined in the Plan), and the DIP Agent (as defined in the Plan). Bidding Procedures ¶ D(v).

(vi)  <u>Contingencies; No Financing or Diligence Outs</u>. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence. Bidding Procedures ¶ D(vi).

(vii)  <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid should also include contact information for the specific person(s) and counsel whom Houlihan Lokey and Kirkland & Ellis LLP should contact regarding such Bid. Bidding Procedures ¶ D(vii).

(viii)  <u>Authorization</u>. Each Bid must contain evidence acceptable to the Debtors that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Transaction contemplated in such Bid. Bidding Procedures ¶ D(viii).

(ix)  <u>As-Is, Where-Is</u>. Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Transaction prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents in making its Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Transaction or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Transaction Documents; and (iv) the Acceptable Bidder did not engage in any collusive conduct and

10

acted in good faith in submitting its Bid. Bidding Procedures ¶ D(ix).

(d)     **<u>Designation of Qualified Bidders</u>**.

(i)     A Bid will be considered a "<u>Qualified Bid</u>," and each Acceptable Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>," if the Debtors, determine that such Bid:

(A)     satisfies the Bid Requirements set forth above;

(B)     is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Winning Bid (as defined below), within a time frame acceptable to the Debtors; and

(C)     when aggregated with other Bids (or portions thereof), provides for:

- either (1) payment in full in cash of all allowed DIP Claims (as defined in the Plan) outstanding on the Effective Date or (2) such other treatment that is acceptable to the Debtors and the DIP Agent; ***plus***

- either (1) payment in full in cash of all allowed Revolving Loan A Claims (as defined in the Plan) outstanding on the Effective Date or (2) such other treatment that is acceptable to the Debtors and the Credit Agreement Primary Agent; ***plus***

- either (1) payment in full in cash of all allowed Revolving Loan A-1 Claims *(*as defined in the Plan) outstanding on the Effective Date or (2) such other treatment that is acceptable to the Debtors and the Credit Agreement Primary Agent; ***plus***

- either (1) payment in full in cash of all allowed *Term Loan B Claims* (as defined in the Plan) outstanding on the Effective Date or (2) such other treatment that is acceptable to the Debtors and the Credit Agreement Primary Agent; ***plus***

- either (1) payment in full in cash of all allowed Term Loan B-1 Claims (as defined in the Plan) outstanding on the Effective Date or (2) such other treatment that

is acceptable to the Debtors and the Term Loan B-1 Agent; *plus*

- payment in full in cash of all administrative, priority, and secured claims (other than the DIP Claims, Revolving Loan A Claims, Revolving Loan A-1 Claims, Term Loan B Claims, and Term Loan B-1 Claims) arising in the Debtors' chapter 11 cases through the Effective Date (as defined in the Plan); *plus*

- payment to holders of General Unsecured Claims (as defined in the Plan) of cash in an amount equal to the GUC Equitization Distribution (as defined in the Plan), which amount may be determined by the Acceptable Bidder and must be acceptable to the Debtors.  Bidding Procedures ¶¶ E(i)-(iii)(g).

(D)    Within two business days after the Bid Deadline, the Debtors will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties and counsel to the Committee a copy of each Qualified Bid. Bidding Procedures ¶ E.

(E)    If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on the date that is three business days after the Bid Deadline.  Bidding Procedures ¶ E.

(F)    Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their Purchase Price, or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.  Bidding Procedures ¶ E.

(G)    Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (1) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a

single consolidated Bid prior to the Bid Deadline or (2) Qualified Bidders to aggregate two or more Qualified Bid into a single Qualified Bid prior to the conclusion of the Auction.  The Debtors reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auction).  Bidding Procedures ¶ E.

(e)     **Right to Credit Bid**.

(i)     Any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.  Bidding Procedures ¶ F.

(ii)    Notwithstanding anything to the contrary contained herein and absent a further order of the Court, each of (A) the DIP Agent, (B) the Credit Agreement Primary Agent and (C) the Term Loan B-1 Agent, shall have the right to credit bid all or any portion of the aggregate amount of its applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit Bid will be considered a Qualified Bid to the extent such Bid is received by the Bid Deadline and complies with section 363(k) of the Bankruptcy Code; *provided* that a credit Bid shall not constitute a Qualified Bid if the Bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment). Bidding Procedures ¶ F.

(f)     **The Auction**.

(i)     If the Debtors receive one or more Qualified Bids, the Debtors will conduct the Auction to determine the Winning Bidder with respect to the Transaction.  Bidding Procedures ¶ G.

(ii)    No later than **February 25, 2019, at 12:00 p.m. (prevailing Central Time)** the Debtors, will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the

Debtors' business judgment (the "Baseline Bid"), and provide copies of the documents supporting the Baseline Bid to all Qualified Bidders, the Committee, and the Notice Parties. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Winning Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the Form Equity Commitment Letter and Form Plan requested by the Qualified Bidder; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the Transaction contemplated by the Baseline Bid; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria"). Bidding Procedures ¶ G.

(iii)    Unless otherwise indicated as provided by the Bidding Procedures Order, the Auction shall take place at **8:00 a.m. (prevailing Central Time) on February 26, 2019**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date and time or location as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

(A)    <u>The Debtors Shall Conduct the Auction</u>.

- The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid.

- Only Qualified Bidders, the Debtors, the Credit Agreement Primary Agent, the Term Loan B-1 Agent, the DIP Agent, and the Committee (and its members), and each of their respective legal and financial advisors, and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and

14

may speak or bid themselves or through duly authorized representatives. Except as otherwise permitted by the Debtors, only Qualified Bidders shall be entitled to bid at the Auction. Bidding Procedures ¶ G(i).

(B)     Terms of Overbids. "Overbid" means any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

- Minimum Overbid Increment. Any Overbid following the Baseline Bid or following any subsequent Prevailing Highest Bid (as defined below) shall be in increments of value (including revised treatment under the Plan) equal to 1% of the Baseline Bid, unless otherwise determined by the Debtors in an exercise of their business judgment.

- Conclusion of Each Overbid Round. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

- Overbid Alterations. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

- Announcing Highest Bid. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid Round, or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things,

the Bid Assessment Criteria.  Bidding Procedures ¶¶ G(ii)-(ii)(d).

(C)     <u>Consideration of Overbids</u>.  The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times, to, among other things, (1) facilitate discussions between the Debtors and Potential Bidders, (2) allow Qualified Bidders to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount.  Bidding Procedures ¶ G(iii).

(D)     <u>Closing the Auction</u>.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their business judgment, to be the highest or otherwise best Qualified Bid.  Such Qualified Bid shall be declared the "<u>Winning Bid</u>" and such Qualified Bidder, the "<u>Winning Bidder</u>," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Court of the Winning Bid. For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Winning Bid, including, as applicable, the Plan, the Plan Supplement (as defined in the Plan), and the Confirmation Order (as defined in the Plan) and, as applicable, cause such definitive documentation to be filed with the Court.  Bidding Procedures ¶ G(iv).

(E)     <u>No Collusion; Good-Faith *Bona Fide* Offer</u>.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (1) it has not engaged in any collusion with respect to the bidding and (2) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed Transaction if selected as the Winning Bidder.  Bidding Procedures ¶ G(v).

**(g)**     **Expense Reimbursement, Work Fee, and Breakup Fee**.

    (i)     Upon entry of the Bidding Procedures Order, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment, to agree to reimburse the reasonable and documented out-of-pocket fees and expenses of one or more Acceptable Bidders (each, an "Expense Reimbursement"), and/or agree to pay one or more Acceptable Bidders a "work fee" or other similar cash fee (each, a "Work Fee") if the Debtors reasonably determine in their business judgment that any such Expense Reimbursement or Work Fee will encourage one or more parties to submit a Qualified Bid or result in a competitive bidding and Auction process. The aggregate amount of all Expense Reimbursements and Work Fees shall not exceed $1,000,000. Pursuant to the Bidding Procedures Order, the Debtors shall be authorized to indefeasibly pay any such amounts to such Acceptable Bidders pursuant to section 363(b)(1) of the Bankruptcy Code and any such amounts paid by the Debtors to such Acceptable Bidders will not be subject to disgorgement irrespective of whether the Acceptable Bidders receiving such reimbursements or payments are ultimately the Winning Bidder as long as such Acceptable Bidder acted in good faith. Bidding Procedures ¶ H.

    (ii)     Upon entry of the Bidding Procedures Order, the Debtors shall be further authorized, but not obligated, in an exercise of their business judgment, to (a) select no more than one Acceptable Bidder to act as a stalking horse bidder (a "Stalking Horse Bidder") in connection with the Auction and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, provide for a breakup fee (the "Breakup Fee") in an amount not to exceed three percent (3%) of the proposed Purchase Price. The amount of any Expense Reimbursement or Work Fee paid to any Stalking Horse Bidder pursuant to these Bidding Procedures shall be deducted from the Breakup Fee, if payable. Bidding Procedures ¶ H.

**(h)**     **Backup Bidder (Local Bankr. R. 6004-1(C))**.

    (i)     Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder") until such time that the Transaction is consummated through confirmation of the Plan, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. Bidding Procedures ¶ I(i).

(ii)    The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Winning Bidder. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until such time that the Transaction is consummated through confirmation of the Plan. The Backup Bidder's Deposit shall be held in escrow pending confirmation of the Plan. Bidding Procedures ¶ I(ii).

(iii)    If the Winning Bidder fails to consummate the approved Transaction contemplated by its Winning Bid, the Debtors may select the Backup Bidder as the Winning Bidder, and such Backup Bidder shall be deemed a Winning Bidder for all purposes. The Debtors will be authorized, but not required, to consummate the Transaction contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Winning Bidder's Deposit shall be forfeited to the Debtors' estates, and the Debtors, on behalf of themselves and their estates, specifically reserve the right to seek all available remedies against the defaulting Winning Bidder, including, but not limited to, specific performance. Bidding Procedures ¶ I(iii).

(i)    **Notice and Consultation Parties**.

(i)    Information that must be provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties: (a) counsel to the Credit Agreement Primary Agent, Wells Fargo Bank, N.A., Otterbourg P.C., 230 Park Avenue, New York, New York 10169, Attn: Chad Simon, Esq.; and (b) counsel to the Term Loan B-1 Agent counsel to the Term Loan B-1 Agent, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004, Attn: Brad Eric Scheler. Bidding Procedures ¶ J.

(ii)    The term "Consultation Parties" as used in these Bidding Procedures shall mean: (a) the Credit Agreement Primary Agent; and (b) the Term Loan B-1 Agent. To the extent that any Consultation Party submits a Bid, it shall no longer be a Consultation Party unless and until it (1) withdraws such Bid, (2) does not thereafter become a Qualified Bidder, or (3) becomes a Qualified Bidder but elects to not participate in, to cease bidding at, or to withdraw from, the Auction. Bidding Procedures ¶ J.

(j)  **"As Is, Where Is."**

(i)  Consummation of any Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted or agreed to by the Debtors. Except as specifically accepted or agreed to by the Debtors, all of the Debtors' right, title, and interest in and to the respective assets or New Shopko Interests will be transferred to the Winning Bidder free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. Bidding Procedures ⁋ K.

•  By submitting a Bid, each Acceptable Bidder will be deemed to acknowledge and represent that it (A) has had an opportunity to conduct adequate due diligence regarding the Transaction prior to making its Bid, (B) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (C) did not rely on or receive from any party any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Transaction or the completeness of any information provided in connection with the Transaction or the Auction. Bidding Procedures ⁋ K.

(k)  **Reservation of Rights (Local Bankr. R. 6004-1(C))**. The Debtors reserve their rights to modify these Bidding Procedures in their business judgment, in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Transaction, including: (i) extending the deadlines set forth in these Bidding Procedures; (ii) adjourning the Auction at the Auction; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; and (v) rejecting any or all Bids or Qualified Bids. Nothing in these Bidding Procedures shall abrogate the fiduciary duties of the Debtors. Bidding Procedures ⁋ L.

(l)  **Consent to Jurisdiction**. All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction, and enforcement of these Bidding Procedures. Bidding Procedures ⁋ M.

(m)  **Confirmation Hearing**. A hearing to consider confirmation of a plan (the "Confirmation Hearing") pursuant to which the Debtors and the Winning Bidder intend to consummate the Transaction contemplated by the Winning

Bid will be held **on or prior to April 12, 2019** and otherwise in accordance with any scheduling order entered by the Court regarding confirmation of such plan.  Bidding Procedures ¶ N.

(n)  **Return of Deposit**.

(i)  The Deposit of the Winning Bidder shall be applied to the Purchase Price of such Transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more escrow accounts on terms acceptable to the Debtors and shall be returned (other than with respect to the Winning Bidder and the Backup Bidder) on the date that is three business days after the Auction. Bidding Procedures ¶ O.

(ii)  If a Winning Bidder fails to consummate a proposed Transaction because of a breach by such Winning Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Winning Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates, and the Debtors shall be free to consummate the proposed Transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.  Bidding Procedures ¶ O.

19.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**II.    Form and Manner of Notice.**

20.    The Auction shall take place at 8:00 a.m. (prevailing Central Time) on February 26, 2019, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such other date and time as selected by the Debtors.

21.    The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further

notice of the Auction shall be required. Accordingly, the Debtors request that the Court approve the form and manner of the notice.

**Basis for Relief**

**I.      The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

22.      Adoption of the Bidding Procedures is a valid exercise of the Debtors' business judgment. Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Trilogy Dev. Co., LLC*, No. 09-42219, 2010 Bankr. LEXIS 5636, at *3–4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the Bankruptcy Code permits the debtor to sell their assets if a sound business purpose exists); *In re Channel One Commc'ns, Inc.*, 117 BR 493 (Bankr. E.D. Mo. 1990) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'" (internal citations omitted)); *see also In re Farmland Indus., Inc.*, 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (holding that courts in this district are reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

23.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998)

21

("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (internal citations omitted)).

24.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

25.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value the Debtors will receive from the Transaction for the benefit of the Debtors' estates.  The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close a Transaction. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

26.    The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with the controlling legal standard.  Accordingly, the Court should approve the Debtors' adoption of the Bidding Procedures as a valid exercise of the Debtors' business judgment.

## II.    The Expense Reimbursement, Work Fee, and Breakup Fee Have a Sound Business Purpose and Should Be Approved.

27.    The Debtors also seek authority, but not direction, pursuant to the Bidding Procedures to pay the Expense Reimbursement and Work Fee in an aggregate amount not to exceed $1,000,000, and, in the event the Debtors elect to enter into a stalking horse agreement with an Acceptable Bidder, the Breakup Fee in an amount not to exceed 3% of any proposed Purchase Price.

28.    The Debtors seek authority to pay the Expense Reimbursement and Work Fee to Acceptable Bidders only in their discretion if the Debtors determine in their business judgment that any such Expense Reimbursement or Work Fee will encourage one or more third parties to submit an initial Overbid or otherwise facilitate a competitive bidding and Auction process. Payment of expense reimbursements and work fees, like those proposed here, in a bidding process for sales is appropriate under section 363(b) of the Bankruptcy Code so long as such payment is a valid exercise of the Debtors' business judgment.  Under section 363(b), the Debtors may use, sell, or lease estate property outside of the ordinary course of business so long as they articulate a sound business reason for doing so.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983).

23

29.     The Debtors believe that granting authority to pay the Expense Reimbursement and Work Fee is in the best interests of their estates.  The Acceptable Bidders will expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Auction, despite the fact that the bids will be subject not only to Court approval, but to overbidding by third parties.  Without the Expense Reimbursement or Work Fee, an Acceptable Bidder may elect not to participate in the process at all to the detriment of the Debtors' estates.  Further, the Bidding Procedures do not *require* the payment of the Expense Reimbursement or Work Fee, the Debtors simply have the *option* of paying or otherwise incurring such obligation in the event that they determine, in their business judgment, that offering an Acceptable Bidder Expense Reimbursement or a Work Fee will result in a competitive bidding process that will maximize value of the Debtors' estates.  In that instance, the value created for the Debtors' estates will likely greatly outweigh the cost of any Expense Reimbursement or Work Fee.

30.     The Debtors further seek authority, but not direction, to pay a Breakup Fee in an amount not to exceed 3% of the proposed Purchase Price, only in the event that the Debtors elect to enter into a stalking horse arrangement with a third-party bidder (*i.e.*, other than the Term Loan Lenders).  The use of a stalking horse in a public auction process for dispositions pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, *1 (E.D. Wis. July 7, 2011); *see also AgriProcessors, Inc. v. Fokkena* (*In re Tama Beef Packing, Inc.*), 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005).  As a result, stalking horse bidders virtually always require breakup fees and, in many cases, other forms of bid protections as an inducement

for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Interforum Holding*, 2011 WL 2671254, at *1 (internal citations omitted).  "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value."  *In re Integrated Res., Inc.*, 147 B.R. 650, 659–60 (S.D.N.Y. 1992) (emphasis added).  Specifically, bid protections may be necessary to convince a white knight bidder to enter the bidding by providing some form of compensation for the risks that it is undertaking.  *E.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").  Thus, the use of bid protections has become an established practice in chapter 11 cases.

31.    As a result, courts routinely approve bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See, e.g.*, *In re Wintz Cos.*, 230 B.R. 840, 847 (B.A.P. 8th Cir. 1999) (holding that bid protections benefitted the estate rather than chilled bidding); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtors believe that the allowance of the Bid protections is in the best interests of the Debtors' estates and their creditors.

32.    Accordingly, for the reasons set forth above, the Court should grant the Debtors the authority to incur and pay the Expense Reimbursement, Work Fee, and Breakup Fee obligations

in their discretion as a valid exercise of the Debtors' business judgment and otherwise within the controlling legal standards in this district.

### III.    The Form and Manner of the Notice Should Be Approved.

33.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Auction.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the deadline for filing any objections to the relief requested herein.

34.    The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of notice of the Auction.

### Waiver of Bankruptcy Rule 6004(a)

35.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

36.    Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability,

or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors'

estates; or (g) a waiver of any claims or causes of action which may exist against any entity under

the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any

payment made pursuant to the Court's order is not intended and should not be construed as an

admission as to the validity of any particular claim or a waiver of the Debtors' rights to

subsequently dispute such claim.

## Notice

37.     The Debtors have provided notice of this Motion to the following parties or their

respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) the holders

of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents

under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility;

(e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service;

(g) the United States Securities and Exchange Commission; (h) the office of the attorneys general

for the states in which the Debtors operate; (i) the United States Attorney's Office for the District

of Nebraska; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The

Debtors submit that, in light of the nature of the relief requested, no other or further notice need

be given.

## No Prior Request

38.     No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the

relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

| | |
|---|---|
| Dated:  January 16, 2019 | /s/ *Michael T. Eversden* |
| Omaha, Nebraska | James J. Niemeier (NE Bar No. 18838) |

Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:    (402) 341-3070
Facsimile:    (402) 341-0216
Email:        jniemeier@mcgrathnorth.com
              meversden@mcgrathnorth.com
              lgoodman@mcgrathnorth.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Travis M. Bayer (*pro hac vice* pending)
Jamie Netznik (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              patrick.nash@kirkland.com
              travis.bayer@kirkland.com
              jamie.netznik@kirkland.com

- and -

Steven Serajeddini (*pro hac vice* pending)
Daniel Rudewicz (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        steven.serajeddini@kirkland.com
              daniel.rudewicz@kirkland.com

*Proposed Co-Counsel to the Debtors*

**<u>Exhibit A</u>**

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19-80064-TLS |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## BIDDING PROCEDURES FOR THE TRANSFER OF
## THE DEBTORS' ASSETS OR NEW SHOPKO INTERESTS

On January 16, 2019 (the "Petition Date"), Specialty Retail Shops Holding Corp. and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nebraska (the "Court"). Also on the Petition Date, the Debtors filed a chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan"). The Plan contemplates either (a) the sale of the Debtors' assets or (b) a reorganization through the issuance, and purchase by a plan sponsor, of new common equity interests in the reorganized Debtors (the "New Shopko Interests") and the continued business of the Debtors (a "Transaction").

On [●], the Court entered the *Order Establishing Bidding Procedures for the Transfer of the Debtors' Assets or New Shopko Interests* (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction") to determine the Transaction that provides the highest or otherwise best offer.

### Marketing Process

A. **Contact Parties**.

The Debtors, in consultation with Houlihan Lokey, Inc. ("Houlihan Lokey"), the Debtors' investment banker, have developed a list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

Transaction. The list of parties includes both strategic investors and financial investors (collectively, the "Contact Parties"). The Debtors and Houlihan Lokey will contact (to the extent not already contacted) the Contact Parties to explore their interest in pursuing a Transaction. The Contact Parties may include parties whom the Debtors or their advisors previously contacted regarding a transaction, regardless of whether such parties expressed any interest at such time in pursuing a transaction. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

The Debtors may distribute (to the extent not already distributed) to each Contact Party and any other interested party an information package consisting of: (i) a copy of the Bidding Procedures, the Bidding Procedures Order, and any other related documents; (ii) a form confidentiality agreement (a "Confidentiality Agreement"); and (iii) such other materials as appropriate under the circumstances.

**B.      Participation Requirements.**

To receive due diligence information, including full access to the Debtors' electronic data room and additional non-public information regarding the Debtors, a party interested in consummating a Transaction (a "Potential Bidder") should deliver (or have delivered) to each of: (i) Houlihan Lokey, 225 South 6th Street, Minneapolis, Minnesota 55402, Attn: Stephen Spencer (SSpencer@HL.com), and Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, New York 10167, Attn: Sanaz Memarsadeghi (SMemarsadeghi@HL.com) and Hussein El Husseini (HElhusseini@HL.com); and (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven Serajeddini (steven.serajeddini@kirkland.com) and Daniel Rudewicz (daniel.rudewicz@kirkland.com), and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Travis Bayer (travis.bayer@kirkland.com) and Jamie Netznik (jamie.netznik@kirkland.com) (the "Debtors' Advisors"), the following documents (collectively, the "Preliminary Bid Documents"):

   (i)     an executed Confidentiality Agreement, substantially in the form attached hereto as **Exhibit A**, to the extent not already executed; and

   (ii)    proof or other documentation acceptable to the Debtors of the Potential Bidder's financial capacity to close a proposed Transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (with the assistance of their advisors).

Promptly after a Potential Bidder delivers Preliminary Bid Documents, the Debtors will determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may proceed to conduct due diligence and ultimately submit a Bid (as defined below) and participate in the Auction, as applicable, and will provide copies of any such notices to the Notice Parties and to counsel to the official committee of unsecured creditors (the "Committee"). Except as otherwise determined in the Debtors' business judgment, only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "Acceptable Bidder") may submit Bids.

Beginning on or as soon as is reasonably practicable after the Debtors determine that a Potential Bidder is an Acceptable Bidder, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request, and the Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room. All due diligence requests must be directed to Houlihan Lokey at the following email address: shopko@hl.com. To the extent reasonably practicable, Houlihan Lokey will also facilitate meetings between any interested Acceptable Bidder and the Debtors' management team, which meetings will proceed in a manner determined by the Debtors, in their reasonable discretion. The due diligence period will end on the Bid Deadline (as defined below), and, subsequent to the Bid Deadline, the Debtors will have no obligation to furnish any due diligence information.

Houlihan Lokey will provide access, in the electronic data room, to a form equity commitment letter ("Form Equity Commitment Letter") and form chapter 11 plan ("Form Plan").

The Debtors and their advisors will coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a Transaction.

For any Acceptable Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold, or to delay providing, any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Acceptable Bidder at such time.

Each Acceptable Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Acceptable Bidder and its contemplated transaction.

## **Auction Process**

### A.    **Bid Deadline.**

An Acceptable Bidder that desires to make a proposal, solicitation, or offer  (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in .pdf or similar format) so as to be **actually received** on or before **February 21, 2019, at 4:00 p.m. (prevailing Central Time)** (the "Bid Deadline") to:

(i)    Houlihan Lokey, 225 South 6th Street, Minneapolis, Minnesota 55402, Attn: Stephen Spencer (SSpencer@HL.com), and Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, New York 10167, Attn: Sanaz Memarsadeghi (SMemarsadeghi@HL.com) and Hussein El Husseini (HElhusseini@HL.com); and

(ii)    Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven Serajeddini (steven.serajeddini@kirkland.com)  and  Daniel Rudewicz

11

(daniel.rudewicz@kirkland.com), and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Travis Bayer (travis.bayer@kirkland.com) and Jamie Netznik (jamie.netznik@kirkland.com).

**B.**     **Bid Requirements.**

Each Bid by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements"):

(i)     **Purpose**. Each Acceptable Bidder must state what the Bid is an offer by the Acceptable Bidder to purchase, including the percentage of the New Shopko Interests.

(ii)     **Purchase Price**. Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, including, for example, certain liabilities to be assumed by the Acceptable Bidder as part of the Plan (the "Purchase Price").

(iii)     **Deposit**. Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid to be held in one or more escrow accounts on terms acceptable to the Debtors (the "Deposit").

(iv)     **Marked Agreement**. Each Bid must include a marked version of the Form Equity Commitment Letter (or other applicable agreement providing the terms of the Transaction) and Form Plan, in each case, together with the exhibits and schedules related thereto and any related Transaction documents or other material documents integral to such Bid, pursuant to which the Acceptable Bidder proposes to effectuate the Transaction (collectively, the "Transaction Documents"). Any modifications to the Transaction contemplated by the Form Equity Commitment Letter (or other applicable agreement providing the terms of the Transaction) and Form Plan must be in form and substance acceptable to the Debtors.

(v)     **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, or shall have covenants and conditions acceptable to the Debtors. For the avoidance of doubt, funding commitments for any Acceptable Bidder's Purchase Price may be provided by one or more of the Credit Agreement Primary Agent (as defined in the Plan), the Term Loan B-1 Agent (as defined in the Plan), and the DIP Agent (as defined in the Plan).

(vi)     **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

(vii)    **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.  Each Bid should also include contact information for the specific person(s) and counsel whom Houlihan Lokey and Kirkland & Ellis LLP should contact regarding such Bid.

(viii)   **Authorization**.  Each Bid must contain evidence acceptable to the Debtors that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Transaction contemplated in such Bid.

(ix)     **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Transaction prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents in making its Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Transaction or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Transaction Documents; and (iv) the Acceptable Bidder did not engage in any collusive conduct and acted in good faith in submitting its Bid.

By submitting its Bid, each Acceptable Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and to refrain from submitting a Bid, or seeking to reopen the Auction, after conclusion of the Auction.  **The submission of a Bid shall constitute a binding and irrevocable offer to consummate the Transaction reflected in such Bid.**

C.     **Designation of Qualified Bidders.**

A Bid will be considered a "Qualified Bid," and each Acceptable Bidder that submits a Qualified Bid will be considered a "Qualified Bidder," if the Debtors, determine that such Bid:

(i)      satisfies the Bid Requirements set forth above;

(ii)     is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Winning Bid (as defined below), within a time frame acceptable to the Debtors; and

(iii)    when aggregated with other Bids (or portions thereof), provides for:

    (a)    either (a) payment in full in cash of all allowed DIP Claims (as defined in the Plan) outstanding on the Effective Date or (b) such other treatment that is acceptable to the Debtors and the DIP Agent; *plus*

    (b)    either (a) payment in full in cash of all allowed Revolving Loan A Claims (as defined in the Plan) outstanding on the Effective Date or (b) such other treatment that is acceptable to the Debtors and the Credit Agreement Primary Agent; *plus*

    (c)    either (a) payment in full in cash of all allowed Revolving Loan A-1 Claims (as defined in the Plan) outstanding on the Effective Date or (b) such other treatment that is acceptable to the Debtors and the Credit Agreement Primary Agent; *plus*

    (d)    either (a) payment in full in cash of all allowed Term Loan B Claims (as defined in the Plan) outstanding on the Effective Date or (b) such other treatment that is acceptable to the Debtors and the Credit Agreement Primary Agent; *plus*

    (e)    either (a) payment in full in cash of all allowed Term Loan B-1 Claims (as defined in the Plan) outstanding on the Effective Date or (b) such other treatment that is acceptable to the Debtors and the Term Loan B-1 Agent; *plus*

    (f)    payment in full in cash of all administrative, priority, and secured claims (other than the DIP Claims, Revolving Loan A Claims, Revolving Loan A-1 Claims, Term Loan B Claims, and Term Loan B-1 Claims) arising in the Debtors' chapter 11 cases through the Effective Date (as defined in the Plan); *plus*

    (g)    payment to holders of General Unsecured Claims (as defined in the Plan) of cash in an amount equal to the GUC Equitization Distribution (as defined in the Plan), which amount may be determined by the Acceptable Bidder and must be acceptable to the Debtors.

Within two business days after the Bid Deadline, the Debtors will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties and counsel to the Committee a copy of each Qualified Bid.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on the date that is three business days after the Bid Deadline.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may

not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (a) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the Bid Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bid into a single Qualified Bid prior to the conclusion of the Auction. The Debtors reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auction).

## D.   <u>Right to Credit Bid</u>.

Any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

Notwithstanding anything to the contrary contained herein and absent a further order of the Court, each of (A) the DIP Agent, (B) the Credit Agreement Primary Agent, and (C) the Term Loan B-1 Agent shall have the right to credit bid all or any portion of the aggregate amount of its applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline and complies with section 363(k) of the Bankruptcy Code; *provided* that a credit bid shall not constitute a Qualified Bid if the Bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment).

## E.   <u>The Auction</u>.

If the Debtors receive one or more Qualified Bids, the Debtors will conduct the Auction to determine the Winning Bidder with respect to the Transaction.

No later than **February 25, 2019, at 12:00 p.m. (prevailing Central Time)**, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment (the "<u>Baseline Bid</u>"), and provide copies of the documents supporting the Baseline Bid to all Qualified Bidders, the Committee, and the Notice Parties. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Winning Bid shall take into account any factors the Debtors reasonably deem

relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the Form Equity Commitment Letter and Form Plan requested by the Qualified Bidder; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the Transaction contemplated by the Baseline Bid; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

Unless otherwise indicated as provided by the Bidding Procedures Order, the Auction shall take place at **8:00 a.m. (prevailing Central Time) on February 26, 2019**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date and time or location as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

(i)  **The Debtors Shall Conduct the Auction**. The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid.

Only Qualified Bidders, the Debtors, the Credit Agreement Primary Agent, the Term Loan B-1 Agent, the DIP Agent, and the Committee (and its members), and each of their respective legal and financial advisors, and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Except as otherwise permitted by the Debtors, only Qualified Bidders shall be entitled to bid at the Auction.

(ii)  **Terms of Overbids**. "Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a)  Minimum Overbid Increment. Any Overbid following the Baseline Bid or following any subsequent Prevailing Highest Bid (as defined below) shall be in increments of value (including revised treatment under the Plan) equal to 1% of the Baseline Bid, unless otherwise determined by the Debtors in an exercise of their business judgment.

(b)  Conclusion of Each Overbid Round. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

16

(c)     Overbid Alterations.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

(d)     Announcing Highest Bid.  Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid Round, or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(iii)   **Consideration of Overbids**.  The Debtors reserve the right, in their business judgment to adjourn the Auction one or more times, to, among other things (i) facilitate discussions between the Debtors and Potential Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount.

(iv)    **Closing the Auction**.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their business judgment, to be the highest or otherwise best Qualified Bid.  Such Qualified Bid shall be declared the "Winning Bid" and such Qualified Bidder, the "Winning Bidder," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Court of the Winning Bid.  For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Winning Bid, including, as applicable, the Plan, the Plan Supplement (as defined in the Plan), and the Confirmation Order (as defined in the Plan) and, as applicable, cause such definitive documentation to be filed with the Court.

(v)     **No Collusion; Good-Faith *Bona Fide* Offer**.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid

17

is a good-faith *bona fide* offer and it intends to consummate the proposed Transaction if selected as the Winning Bidder.

**F.      Expense Reimbursement, Work Fee, and Breakup Fee.**

Upon entry of the Bidding Procedures Order, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment, to agree to reimburse the reasonable and documented out-of-pocket fees and expenses of one or more Acceptable Bidders (each, an "Expense Reimbursement"), and/or agree to pay one or more Acceptable Bidders a "work fee" or other similar cash fee (each, a "Work Fee") if the Debtors reasonably determine in their business judgment that any such Expense Reimbursement or Work Fee will encourage one or more parties to submit a Qualified Bid or result in a competitive bidding and Auction process. The aggregate amount of all Expense Reimbursements and Work Fees shall not exceed $1,000,000. Pursuant to the Bidding Procedures Order, the Debtors shall be authorized to indefeasibly pay any such amounts to such Acceptable Bidders pursuant to section 363(b)(1) of the Bankruptcy Code and any such amounts paid by the Debtors to such Acceptable Bidders will not be subject to disgorgement irrespective of whether the Acceptable Bidders receiving such reimbursements or payments are ultimately the Winning Bidder as long as such Acceptable Bidder acted in good faith.

Upon entry of the Bidding Procedures Order, the Debtors shall be further authorized, but not obligated, in an exercise of their business judgment, to (a) select no more than one Acceptable Bidder to act as a stalking horse bidder (a "Stalking Horse Bidder") in connection with the Auction and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, provide for a breakup fee (the "Breakup Fee") in an amount not to exceed three percent (3%) of the proposed Purchase Price. The amount of any Expense Reimbursement or Work Fee paid to any Stalking Horse Bidder pursuant to these Bidding Procedures shall be deducted from the Breakup Fee, if payable.

**G.      Backup Bidder.**

(i)      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder") until such time that the Transaction is consummated through confirmation of the Plan, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(ii)      The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Winning Bidder. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until such time that the Transaction is consummated through confirmation of the Plan. The Backup Bidder's Deposit shall be held in escrow pending confirmation of the Plan.

18

(iii)   If the Winning Bidder fails to consummate the approved Transaction contemplated by its Winning Bid, the Debtors may select the Backup Bidder as the Winning Bidder, and such Backup Bidder shall be deemed a Winning Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate the Transaction contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  In such case, the defaulting Winning Bidder's Deposit shall be forfeited to the Debtors' estates, and the Debtors, on behalf of themselves and their estates, specifically reserve the right to seek all available remedies against the defaulting Winning Bidder, including, but not limited to, specific performance.

**H.    Notice and Consultation Parties.**

Information that must be provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties: (a) counsel to the Credit Agreement Primary Agent, Wells Fargo Bank, N.A., Otterbourg P.C., 230 Park Avenue, New York, New York 10169, Attn: Chad Simon, Esq.; and (b) counsel to the Term Loan B-1 Agent, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004, Attn: Brad Eric Scheler**.**

The term "Consultation Parties" as used in) these Bidding Procedures shall mean: (a) the Credit Agreement Primary Agent; and (b) the Term Loan B-1 Agent.  To the extent that any Consultation Party submits a Bid, it shall no longer be a Consultation Party unless and until it (i) withdraws such Bid, (ii) does not thereafter become a Qualified Bidder, or (iii) becomes a Qualified Bidder but elects to not participate in, to cease bidding at, or to withdraw from the Auction.

**I.    "As Is, Where Is".**

Consummation of any Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted or agreed to by the Debtors.  Except as specifically accepted or agreed to by the Debtors, all of the Debtors' right, title, and interest in and to the respective assets or New Shopko Interests will be transferred to the Winning Bidder free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code.

By submitting a Bid, each Acceptable Bidder will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct adequate due diligence regarding the Transaction prior to making its Bid, (b) has relied solely on its own independent review, investigation, and inspection of any document including executory contracts and unexpired leases, in making its Bid, and (c) did not rely on or receive from any party any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Transaction or the completeness of any information provided in connection with the Transaction or the Auction.

**J.**     **Reservation of Rights.**

The Debtors reserve their rights to modify these Bidding Procedures in their business judgment, in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Transaction, including: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids. Nothing in these Bidding Procedures shall abrogate the fiduciary duties of the Debtors.

**K.**     **Consent to Jurisdiction.**

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures

**L.**     **Confirmation Hearing.**

A hearing to consider confirmation of a plan (the "Confirmation Hearing") pursuant to which the Debtors and the Winning Bidder intend to consummate the Transaction contemplated by the Winning Bid will be held **on or prior to April 12, 2019** and otherwise in accordance with any scheduling order entered by the Court regarding confirmation of such plan.

**The Confirmation Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Confirmation Hearing. No further notice of any such continuance will be required to be provided to any party.**

**M.**     **Return of Deposit.**

The Deposit of the Winning Bidder shall be applied to the Purchase Price of such Transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more escrow accounts on terms acceptable to the Debtors and shall be returned (other than with respect to the Winning Bidder and the Backup Bidder) on the date that is three business days after the Auction.

If a Winning Bidder fails to consummate a proposed Transaction because of a breach by such Winning Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Winning Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates, and the Debtors shall be free to consummate the proposed Transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

**N.**     **No Modification of Bidding Procedures.**

These Bidding Procedures may not be modified except in accordance with Section J of these Bidding Procedures.

## **Exhibit 1**

**Form Confidentiality Agreement**

**[Date]**

**[Addressee's Name]**
**[Addressee's Title]**
**[Buyer's Name]**
**[Buyer's Address]**

Dear **[Addressee's Name]**:

You have expressed interest in pursuing a transaction (the "Transaction") involving certain assets of Specialty Retail Shops Holding Corp. and its subsidiaries (the "Company"). You understand that prior to or during the course of negotiations in respect of the Transaction, certain information concerning the Company and/or the Company's affiliates, including, without limitation, any Information Memorandum (or similar document) prepared in connection therewith, may be disclosed to you, your affiliates and your or their directors, officers, employees and advisors ("your representatives"), either in written form or orally (the "Evaluation Material"). In consideration of the Company agreeing to make the Evaluation Material available to you or your representatives, you agree as follows:

1.  No disclosure of your interest in the Transaction or the Company will be made by you or your representatives prior to the date of closing of the Transaction between you and the Company, except as may be otherwise (a) agreed upon by you and the Company or (b) required by applicable law or regulatory authority, but only after you have complied with the requirements of paragraph 5.

2.  The fact that the Company is providing Evaluation Material to you, the fact that the parties have had, are having or may have discussions concerning the Transaction, and any negotiations that may occur between you and the Company shall also be deemed Evaluation Material and treated in accordance with the provisions hereof. All Evaluation Material will be held in complete confidence and, without the Company's prior written consent, will not be disclosed, in whole or in part, to any other person (other than such of your representatives who need access to any such materials or information for purposes of your evaluating or negotiating the Transaction), nor will any Evaluation Material be used in any way directly or indirectly detrimental to the Company or its affiliates or for any purpose other than your evaluation or negotiation of the Transaction. The term "Evaluation Material" does not include any information:

    (a) which at the time of disclosure to you or your representatives is in the public domain or which after such disclosure comes into the public domain through no fault of you or your representatives; or

    (b) which was available to you on a non-confidential basis from a source other than the Company or its advisors, provided that such source is not and was not bound by a confidentiality agreement with the Company.

3.  You shall be responsible for ensuring that your representatives adhere to the terms of the undertakings of this agreement as if such persons were original parties hereto.

4. You acknowledge that, all Evaluation Material is and shall remain the exclusive property of the Company. You and your representatives will return to the Company upon demand, or in the event you cease to be interested in pursuing the Transaction, all Evaluation Material provided to you or your representatives, including all copies thereof which may have been made by or on behalf of you or your representatives, and you shall destroy, or cause to be destroyed, all notes or memoranda or other stored information of any kind prepared by you or your representatives relating to the Evaluation Material or negotiations generally, such destruction to be certified to the Company by your officer or other authorized person supervising such destruction; provided, however, that you shall be entitled to retain one copy of the Evaluation Material if necessary to comply with applicable law, rule or regulation, provided that any retained Evaluation Material shall remain subject to the terms of this agreement for so long as it is retained.

5. If, based on the written advice of your outside legal counsel, you or your representatives become (or if it is reasonably likely that you or they shall become) legally compelled to disclose any Evaluation Material, immediate notice of such fact shall be given to the Company so that appropriate action may be taken by the Company, and you agree to cooperate with the Company in any manner reasonably requested by the Company.

6. Without prejudice to any other rights or remedies the Company may have, you acknowledge and agree that money damages would not be an adequate remedy for any breach of this agreement and that the Company shall be entitled to seek the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach of this agreement. You agree to, and to use your best efforts to cause your representatives to, waive any requirement for the securing or posting of any bond in connection with any such remedy.

7. You acknowledge that, except as may be set forth in a definitive, written purchase agreement in respect of the Transaction, neither the Company or its affiliates, nor any of its or their directors, officers, employees or advisors shall have made or be deemed to have made, or shall be responsible for, any representations or warranties, express or implied, with respect to the accuracy or completeness of the Evaluation Material supplied under this agreement. Further, it is acknowledged hereby by you that only those representations and warranties made by the Company in a definitive, written purchase agreement in respect of the Transaction executed and delivered by an officer of each party or other authorized person on behalf of each party shall have any force or effect.

8. During the period of two years commencing on the date hereof, neither you nor any of your affiliates who receive Evaluation Material (including without limitation knowledge of the Transaction) shall solicit or actively seek to hire, hire or employ any person who during such period is employed by the Company, whether or not such person would commit any breach of such person's contract of service in leaving such employment.

9. You acknowledge and confirm that no information provided, or statements made, to you or your representatives prior to, in the course of or for the purpose of negotiations, will constitute an offer by the Company or on the Company's behalf, nor will any such information or statements form the basis of any commitment, contract or agreement (including, without limitation, an agreement in principle), to sell the Company or any of its capital stock or assets. You acknowledge that you shall have no claim whatsoever against the Company or any of its directors, officers, employees, advisors, attorneys, accountants,

consultants, subcontractors, affiliates, owners or representatives arising out of or relating to any Transaction or Evaluation Material.

10. You acknowledge that the Company and the Company's advisors shall be free to conduct the process in respect of the Transaction as they in their sole discretion shall determine, including, without limitation, negotiating and/or terminating negotiations with any prospective or interested parties at any time, with or without any reason therefor.

11. You will maintain contact with the Company at all times only through Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the Company's financial advisor, or employees or representatives of the Company specified by Houlihan Lokey, and will not attempt any direct communication with the Company or any of its employees, customers, landlords or suppliers without the express permission of Houlihan Lokey.

12. No failure or delay by the Company in exercising any right, power or privilege under this agreement shall operate as a waiver thereof, and no waiver, amendment, supplement or modification hereof shall be effective, unless in writing and signed by an officer of the Company or other authorized person on its behalf.

13. The illegality, invalidity or unenforceability of any provision hereof under the laws of any jurisdiction shall not affect its legality, validity or enforceability under the laws of any other jurisdiction, nor the legality, validity or enforceability of any other provision.

14. This agreement shall terminate two years from the date hereof.

15. Following the consummation of a Transaction, the Company's current shareholders and their affiliates shall retain the right to publish the Company's historical sales and EBITDA information for the period during which the Company was owned by such shareholders.

16. This agreement may be executed in one or more counterparts, each of which will be deemed an original copy of this agreement, and all of which, taken together, shall be deemed to constitute one and the same agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. Any action arising out of or relating to this Agreement shall be heard and determined exclusively in the United States Bankruptcy Court for the District of Nebraska or the United States District Court for the District of Nebraska, and each of the parties hereto irrevocably submits to the jurisdiction of such federal courts located in Nebraska.

Very truly yours,

**Houlihan Lokey Capital, Inc.**, solely as Company's representative

By: _____

      Name: **[Authorized Signatory's Name]**
      Title:   **[Authorized Signatory's Title]**

Accepted and agreed to as of the date hereof:

**[BUYER'S NAME]**

By: _____
    Name: **[Authorized Signatory's Name]**
    Title:  **[Authorized Signatory's Title]**